**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CONTINENTAL CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO 04-0766-KD-C** |
| | ) | |
| **COMPASS BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

On December 1, 2004, Continental Casualty Company (plaintiff) filed this subrogation action against Compass Bank (defendant) to recover $915,971.00 paid by plaintiff to its insured SCI/Radney Corporation as a result of an embezzlement scheme conducted at the central accounting office for four funeral homes owned and operated by SCI/Radney. (Doc. 1). The amended complaint alleges 1) in Count I that the defendant failed to exercise ordinary care and good faith in violation of Code of Alabama §§ 7-3-404, 7-3-405, and 7-3-406; 2) in Count II that defendant owes plaintiff for money had and received; 3) in Count III that defendant aided and abetted a breach of fiduciary duty and 4) in Count IV that defendant converted plaintiff's property which facilitated a breach of fiduciary duty. (Doc. 220)  Plaintiff also demands punitive damages as to each count. (Id.)

This matter is currently before the Court on the defendant's motion for partial summary judgment (Doc. 22), plaintiff's response in opposition (Doc. 43), defendant's reply (Doc. 47), plaintiff's sur-reply (Doc. 94) and defendant's response to sur-reply (Doc. 106).  As set forth in

1

detail below, upon consideration of all matters presented, and after reviewing the record in a light most favorable to the plaintiff,[1] the Court determines that defendant's motion for partial summary judgment as a matter of law as to Count I is due to be **DENIED**.  As to Count II the Court finds that the motion for summary judgment is due to be **DENIED**.  The Court further finds that defendant's motion for summary judgment as a matter of law as to Counts III and IV is due to be **GRANTED**.  The defendant's motion for summary judgment as a matter of law as to plaintiff's claim for punitive damages is **GRANTED.**


I.      <u>**Factual Background**</u>

1. Service Corporation International (SCI/Radney) owned and operated four funeral homes in the Mobile, Alabama area including Radney Funeral Home on Dauphin Street. Continental Casualty Company (Plaintiff) is the fidelity insurer of SCI/Radney. (Doc. 1).

2. For twelve years, Vivian Elaine Howe (Howe) also known as Elaine H. Howe was employed by SCI/Radney as an Accounting Center Insurance Processing Clerk at SCI/Radney's Mobile Accounting Center (MAC) located at Radney. (Doc. 1).  Howe's job duties included processing insurance claims and receiving insurance payments from Brown Services,[2] a pre-arranged funeral insurance provider. (Doc. 1, Doc. 22 at pgs. 22-24, SCI/Radney internal memorandum of April 26, 2002).  Brown Services claims from all four funeral homes were processed at the MAC. (Doc. 1).

_____

[1]  The Court, when ruling on a motion for summary judgment, "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party."  <u>Miller v. King</u>, 384 F.3d 1248, 1258-59 (11th Cir. 2004) (citations omitted).

[2] Howe, SCI/Radney and Brown Services are not parties to this lawsuit. (Doc. 1).

3. From June 1996 until March 11, 2002, Howe embezzled approximately $915,971.00 from SCI/Radney by generating approximately 1300 fraudulent refund checks to SCI customers, forging their indorsements and depositing them at defendant's Crichton branch into one or more of her personal bank accounts. Her actions were described as follows in an SCI/Radney internal audit memorandum:

> Ms. Howe would select at-need accounts which were paid-in-full or several months old with minimal outstanding balances. She then created fake Brown Services policy numbers for the customers and submitted fraudulent claim documents to the Accounting Center Accounts Payable Clerk making it appear the customers had a Brown Services preneed insurance policy. The fake claim documents were never submitted to Brown Services. Ms. Howe obtained the refund checks, forged customer signatures on the checks and cashed the checks. A significant number of the checks were cashed at Compass Bank.

> Ms. Howe had been caught cashing customer refund checks in 1999 and again in 2000. Ms. Howe was given a verbal warning in 1999 and a written reprimand in 2000 which stated she would be terminated if she cashed another refund check. Both times Ms. Howe stated she had cashed the checks at the customer's request. Neither incident was reported to Region Management and a detailed review of Ms. Howe's activities was not performed.
> . . .

> This investigation was initiated as a result of two incidents which occurred at the [MAC] in March 2002. Mr. Torston, Funeral Director, requested Betty Mill, Accounting Center Manager, investigate a customer refund check which the family stated had not been received. Ms. Mills orders a copy of the cancelled check from the Houston Bank Reconciliation Department and found it have been cashed by Ms. Howe. Ms. Mills and Kenneth Hart, Location Manager, met and agreed to terminate Ms. Howe since she had been give a verbal warning in 1999 and a written reprimand in 2000 not to cash any more customer refund checks. Ms. Howe was terminated on March 11, 2002. About a week later, Mr. Hart was following up on a Customer Satisfaction Survey comment when he found a copy of a customer refund check in the file. The file contained a Brown Services Certification Form but did not contain a copy of the Brown Services Policy. Mr. Hart asked Carol Dorgan, Accounts Payable Clerk, to order a copy of the canceled check from the Houston Bank Reconciliation Department. When the check arrived, Mr. Hart found Ms. Howe had cashed the check. Mr. Hart subsequently obtained eleven other canceled checks totaling $8,172, which had been cashed by Ms. Howe.

3

. . .

Brown Services is a preneed funeral insurance provider exclusive to Alabama residents. Retail values on Brown Services policies generally range from $100 to $800. SCI contracts with Brown Services to provide funeral services for Brown Services policyholders. SCI provides the funeral service and then invoices Brown Services for the insurance proceeds. It is SCI's practice to refund a customer the value of the Brown Services policy when services have been provided and paid for prior to the family becoming aware of an existing Brown Services policy.

To obtain reimbursement from Brown Services, SCI submits a Certification Form (Brown Services form #156-2-66-25M, certifying the deceased name, policy number and date of death) and an Invoice (Brown Services form #FH69-1000 BKS). Brown Services reimburses SCI monthly for funeral invoiced during the month. The reimbursements from Brown Services do not contain detail policyholder or payment information.

Prior to the September 2000 incident, if a customer refund was required, Ms. Howe only had to submit an SCI Adjustment to Accounts Receivable Form and a copy of the adjusted customer statement from the location's account receivable package to Ms. Mills for approval. The approved documents would be forwarded to an Accounts Payable Clerk for issuance of the refund check. The Accounts Payable Clerk would return the check to Ms. Howe for mailing to the customer.

After the September 2000 incident, Ms. Howe had to submit the Brown Services Certification Form, Brown Services invoice and the SCI Adjustment to Accounts Receivable Form to Ms. Mills for approval. The approved documents would be forwarded to an Accounts Payable Clerk for issuance of a refund check. The Accounts Payable Clerk was instructed to mail the check and not return it to Ms. Howe. Ms. Howe retrieved the refund checks from the mailbox before the courier took the mail to the post office. When a new Account Payable Clerk was hired [,] Ms. Howe obtained the checks from the new Accounts Payable Clerk.

For the period 1997 to March 2002, Brown Services provided us with a report of payments made to the [MAC]. The report contained the name of the insured, policy number, and date paid. Location copies of the Brown Services Invoices and SCI customer rebate check stubs were traced to the Brown Services report. We found 869 refund checks which had been issued based on fraudulent Brown Services documentation. Copies of the cancelled checks obtained from the Houston Bank Reconciliation Department revealed the checks had been cashed by Ms. Howe.

For 1996, we obtained a Check Distribution Report provided by the Accounting Center Manager. Copies of cancelled checks were obtained from the Houston

4

Bank Reconciliation Department for refunds between $400 and $1000 issued from June to December 1996. June 1996 was the last month SCI had checks available on the CD's from the bank. We found 124 checks which had been cashed by Ms. Howe.

We also obtained an AS400 Accounts Payable System report of disbursements made by the Accounting Center for Laotians 4201, 4405, 4406 and 4959 during the period 1998 to March 2002 (disbursements prior to 1998 were not listed on the Accounts Payable System). Based on a review of the report 3,331 customer refund checks were issued during the period. Copies of cancelled checks were obtained from the Houston Bank Reconciliation Department for refunds between $400 and $800 which were not included in the Brown Services report testing. We found an additional 240 refund checks which had been cashed by Ms. Howe.

(Doc. 22, Exhibit B, at p. 22-24, to Exhibit A, SCI memorandum of April 26, 2002; see also Doc. 43, Exhibit H, 2002 SCI investigation synopsis prepared by investigator, James A. "Buddy" Downs). The memorandum also referenced a "list of procedures which should be in place to control third party reimbursements" and that during the investigation, the investigator determined that these controls were not in place at the MAC. (Doc. 22, Exhibit B, at p. 25-26, to Exhibit A).

4.   Howe deposited most if not all of the embezzled checks containing forged third-party endorsements into her bank accounts at the Crichton Branch of defendant Compass Bank. (Doc. 43, Exhibit G, Doc. 94). The signature card dated July 7, 1995, shows the account was opened as a sole account in the name of Elaine H. Howe at the Crichton Branch by "J. Taylor." (Doc. 43, Exhibit K, Doc. 94).

5.   Howe's bank statement for account 36535989, the primary account used for the embezzlement scheme, indicates that her statement address included her name and underneath "c/o Radney Funeral Home". (Doc. 43, Exhibits E, F, G).

6. Copies of the bank deposit slips do not indicate that the "c/o Radney Funeral Home"

phrase was included on the deposit slips. (Doc. 43, Exhibit J, Exhibit L).

7. Defendant's form entitled "Customer Employment History" dated April 20, 2005,

indicates that Howe worked at Radney Funeral Home but does not provide any other information.

(Doc. 43, Exhibit D).

8. Defendant published "Guidelines for Accepting Deposits" effective April 1996 and on

the subject of the  "Responsibility of Receiving Teller" indicated in paragraph 7(b) as follows:

> Check to see that all checks are endorsed by the payee(s) and the depositor, if
> different.  These endorsements should be restricted to an area not more than 1 ½"
> from the trailing edge of the check.  See Exhibit 505.1, page 5.
> . . .
> (b) Verify that the endorsement is complete and acceptable to our bank.
> When we accept an item for deposit and put our bank's endorsement on it, we
> guarantee all prior endorsements (meaning prior endorser's signatures are genuine
> and authorized).  Exceptions to these guidelines are to be approved by the
> Administrative Manager, Quality Service Manager or designee up to check
> cashing approval limit. . . . All payees other than the depositor must endorse the
> check exactly as their names appear on the face of the check in the presence of the
> teller.

(Doc. 43, Exhibit M, p. 2).   Paragraph 9 states as follows:

> Since certain deposits have greater risk to the bank than other, review all deposits
> to determine if they fall into a high risk category.  That review should include a
> careful check of endorsements as this is our primary defense against most fraud
> losses.  Our insurance coverage has an extremely high deductible and is not a
> substitute for careful deposit handling.  Refer deposits described below to the
> Administrative Manager, Quality Service Manager, or designated person for
> approval.
> . . .
> (g) Checks which do not meet the endorsement requirements in Step 7b above.

(Id. at p. 3)   Defendant also published "Guidelines for Accepting Deposits" effective December

9, 1998 on the subject of "Quick Business Deposits", which applies to business and other

customers making high volume cash deposits.  The guideline indicates that the bank will provide

a "Quick Business Deposit Bag" for their use and that "[i]f the customer's currency deposits for

the day are in excess of $10,000 and (if applicable) they have exceed their pre-approved exemption limit, complete a Currency Transaction Report." (Id., at p.10).

9.  Plaintiff insured SCI/Radney under a commercial crime policy, and on April 11, 2003, SCI/Radney was compensated by Plaintiff in the amount of $915,971.00 less a $100,000.00 deductible, pursuant to a Partial Payment Agreement and Assignment of Claims for Howe's embezzlement.  SCI/Radney assigned its rights, title, and interest in all monies that might be recovered to Plaintiff. (Docs. 1, 43, 94).

10.  On April 2, 2004, plaintiff wrote defendant to inquire whether defendant would enter into a tolling agreement and ultimately, a tolling agreement effective April 16, 2004 was executed by the parties' representatives. (Doc. 22, Exhibit 2 to Exhibit A).  The tolling agreement initially was to terminate on July 16, 2004, but was extended by agreement to August 31, 2004, September 30, 2004, October 15, 2004 and November 15, 2004. (Doc. 22, Exhibit 3 to Exhibit A).  The complaint was filed on December 14, 2005. (Doc. 1).  Plaintiff seeks to recover the sum of $915,971.00 from defendant. (Doc. 1).

## II.    Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[3]  The party

---

[3]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall  be granted:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id. "If the nonmoving party fails to makes 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986))(footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted). However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 534 U.S.1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

 With this legal framework in mind, the Court now turns to the specific grounds upon which defendant bases its motion for summary judgment.

---

Fed. R. Civ. P. 56(c).

**III.  COUNT I**

In Count I of the complaint plaintiff alleges negligence and lack of good faith under <u>Ala</u>.

<u>Code</u> §§ 7-3-404, 7-3-405 and 7-3-406 (1975).  Defendant argues that it is entitled to partial

summary judgment on Count I for all claims arising before April 16, 2001 because <u>Ala</u>. <u>Code</u> § 7-

3-118(g) sets a three year statute of limitation which bars recovery of damages prior to that date.[4]

The code section sets forth as follows:

> (g) Conversion, breach of warranty and other Article 3 actions. -- Unless governed
> by other law regarding claims for indemnity or contribution, an action (i) for
> conversion of an instrument, for money had and received, or like action based on
> conversion, (ii) for breach of warranty, or (iii) to enforce an obligation, duty, or
> right arising under this article and not governed by this section must be
> commenced within three years after the cause of action accrues.

<u>Ala</u>. <u>Code</u> § 7-3-118 (1975).  Defendant states that the parties entered into a tolling agreement

effective April 16, 2004, (Doc. 22, Exhibit 2);[5] however, the agreement did not toll the statute of

limitations from applying to checks deposited before April 16, 2001.  Thus, defendant argues that

it would be responsible only for the funds paid for checks deposited between April 16, 2001 and

March 2002 when the embezzlement scheme ended. (Doc. 22).

Plaintiff responds that defendant fraudulently concealed its wrongdoing and thus the

---

[4] Defendant also argues that it is entitled to summary judgment on plaintiff's claims to
the extent the claims are predicated on <u>Ala</u>. <u>Code</u> § 7-3-404 because the section is not applicable
to the situation described by plaintiff.  Plaintiff does not oppose the dismissal of its claim under
<u>Ala</u>. <u>Code</u> § 7-3-404. (Doc 43-1, p. 16)  Accordingly, the claim is **DISMISSED.**

[5] On April 2, 2004, plaintiff wrote defendant and informed defendant that from
"approximately May 31, 1996 to March 8, 2002, Compass Bank ("Compass") either cashed or
accepted for deposit for Elaine Howe over 1,200 SCI checks[.]" (Doc. 22, Exhibit 1 to Exhibit A,
Affidavit of B. Shane Clanton, Associate General Counsel, Compass Bank).  The tolling
agreement became effective on April 16, 2004 and initially was to terminate on July 16, 2004,
but was extended by agreement to August 31, 2004, September 30, 2004, October 15, 2004 and
November 15, 2004. (Doc. 22, Exhibit 3 to Exhibit A).

statute of limitations was tolled for the entire period defendant accepted the forged checks for

deposit (1996 through 2002). (Doc. 43).  Plaintiff argues Alabama's "savings clause" prevents the

statute of limitation from barring its' cause of action against defendant. Ala. Code  § 6-2-3,

entitled "Accrual of claim -- Fraud", sets forth as follows:

> In actions seeking relief on the ground of fraud where the statute has created a bar,
> the claim must not be considered as having accrued until the discovery by the
> aggrieved party of the fact constituting the fraud, after which he must have two
> years within which to prosecute his action.

Ala. Code § 6-2-3.

The plain words of this section, "in actions seeking relief on the ground of fraud", indicate

that the "savings clause" would only apply to actions where the plaintiff has alleged fraud.

However, Alabama courts have held otherwise.  In Rutledge v. Freeman, 914 So. 2d 364 (Ala.

Civ. App. 2004) the Court held that "[a]lthough the wording of § 6-2-3, indicates that it applies

only to fraud actions, that section and its predecessor have long been held to apply to any cause of

action that has been fraudulently concealed from a plaintiff." Id. at 368.  Furthermore, in

Tonsmeire v. Tonsmeire, 233 So.2d 465 (Ala. 1970), an action for libel, the Court held in

reference to § 6-2-3, "while the above code section speaks of 'actions seeking relief on the

grounds of fraud' it has been applied to other torts not arising in fraud in appropriate cases, and

applies to a fraudulent concealment of the existence of a cause of action". Id. at 467.   The

Alabama Supreme Court stated in Garrett v. Raytheon Co., 368 So.2d 516 (Ala. 1979) that "[o]f

course, Alabama does recognize that a fraudulent concealment by a defendant tolls the running of

the statute until the tort or injury is discovered or could have been discovered by due diligence."

Id. at 521.  Also in Hudson v. Moore, 194 So. 147 (Ala. 1940) superseded by statute on other

grounds as noted in Ex parte Sonnier, 707 So.2d 635, 638 (Ala.1997), the Court stated that

> [w]hile this statute is usually applicable to cases wherein fraud is the basis of the cause of action, it is the settled construction that its purpose is to make available at law the rule theretofore prevailing in equity; and applies to a fraudulent concealment of the existence of a cause of action from the party in whose favor the cause of action exists. A party cannot profit by his own wrong in concealing a cause of action against himself until barred by limitation.  The statute of limitations cannot be converted into an instrument of fraud. (citations omitted).

Id. at 149.  Moreover, the Eleventh Circuit recognized this extension of Ala. Code § 6-2-3 in

Sellers v. A.H. Robins Co, Inc., 715 F.2d 1559, 1561 (11th Cir. 1983).

Thus whether under Ala. Code § 6-2-3 or Alabama case law, it appears to be Alabama law that a negligence claim can be tolled if the defendant has fraudulently concealed the basis for the claim.  However, herein lies the problem.  While it may be a matter of semantics, plaintiff has presented evidence and argument in an attempt to show that defendant fraudulently concealed the embezzlement scheme of Howe.  However, in Count I, plaintiff alleges lack of ordinary care and good faith by defendant for cashing checks with forged endorsements.  The claim at issue is not for embezzlement or participation in the embezzlement.  Thus, plaintiff must show, in order to toll the statute, that defendant fraudulently concealed its alleged lack of ordinary care and good faith in cashing the forged checks.  "A plaintiff using section 6-2-3 to toll the statute of limitations bears the burden of proving fraudulent concealment. (citations omitted) A plaintiff using the tolling statute must allege, or on summary judgement establish, prima facie facts which show that the defendant fraudulently prevented discovery of the wrongful act on which the action is based." Sellers, 715 F.2d at 1561.

Plaintiff presents the following evidence in support of its allegation that defendant engaged in fraudulent concealment:

• That a teller supervisor opened the "c/o Radney" account for Howe, despite admitting that she had no authority to open accounts. (Def. Supp. Answers to Pl.'s Interrog. No.2(a)(2), Ex. D;

Dep. of Jeanette Taylor at 32-33, 89-90, 93-94, 143, Ex. E).

• That the same teller supervisor accepted or approved early deposits to that account. (Taylor Dep., Ex. E at 41, 43, 45).

• That after the teller supervisor opened the fraudulent "c/o Radney" account for Howe without authority, virtually all of the several accounts Compass opened for Howe were "dummy" accounts with no real activity. (McNichol Dep., Ex. C at 188-194).

• That the first "dummy" account was opened by Helen Sylvester, who was terminated within a few months for opening 70 "dummy" accounts at a new branch. (See signature card for account no. 38177060 and Helen Sylvester termination memos dated April 5, 2000 and March 22, 2000, Ex. F).

• That the next branch manager, Jennifer Gaston, was terminated for opening a fraudulent account in collusion with a customer. (Dinkins Dep., Ex. B at 49, 53).

• That an internal Compass document indicates that the Crichton branch was known for being plagued by losses and forgeries. (Ex. G).

• That although there were closer Compass branches, Howe deposited all of her forged checks at the Crichton branch for more than six years.

• That teller Pam Jackson and senior teller Ollie Green co-workers for 20 years at the Crichton branch, accepted most of the high-risk third-party checks deposited by Howe. (Def. Supp. Answers to Pl.'s Interrog. No. 3, Ex. D).

• That the Crichton branch accepted deposits of Howe's third-party checks virtually daily and often multiple times per day, accepting up to four or more third-party checks a day. (Ex. H, all deposited 6/1/01 per monthly statement).

• That at least one teller supervisor viewed these checks as suspicious, but was told to accept them. (Dinkins Dep., Ex. B at 56-58).

• That minimal investigation of the ongoing activity by Howe, including multiple deposits in a day or week, presented numerous "red flags," was "highly suspicious," a "very suspicious set of circumstances," and should have led to the preparation of a Suspicious Activity Report. (Id. at 88-92).

• That another teller who questioned whether the checks should be accepted was told by teller Pam Jackson or senior teller Ollie Green to accept them. (Dep. of David Owen at 42-43, Ex. I).

• That [David Owen] teller was also told by teller Pam Jackson that Howe was cashing checks

for all these payees, an explanation incredible on its face. (Id. at 42, 52, 55, 117).

• That teller Pam Jackson has stated separately that she thought they were payroll checks, which makes even less sense, given the daily frequency, dollar amounts and multiple payees; that Howe would have received 15 to 30 or more payroll checks per month, payable to 15 to 30 different persons, is an assertion that is patently nonsensical. (Jackson Dep., Ex. A at 102-03).

• That senior teller Ollie Green claimed not to know whether her 20-year colleague, teller P.J., had been married or had children, a denial that even teller Pam Jackson states is untruthful. (Id. at 129-30).

• That throughout Howe's scheme, despite her suspicious deposit activity for more than six years, Compass never contacted Radney concerning the more than 1,300 checks drawn on its account, nor did Compass ever inform Radney that Compass had opened Howe's personal "c/o Radney" account.

(Doc. 94).

In order to establish that defendant fraudulently concealed its failure to exercise ordinary care and good faith, the plaintiff would have to show

> (1) that the defendant had a duty to disclose a material fact; (2) that the defendant either failed to disclose or concealed that material fact; (3) that the defendant's failure to disclose or his concealment of that material fact induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered damage as a result of his action, or inaction, induced by the defendant's failure to disclose or his concealment of the material fact.

Soniat v. Johnson-Rast & Hays, 626 So. 2d 1256, 1258-59 (Ala. 1993).

Plaintiff repeatedly argues that the motion for summary judgment is premature and that further discovery may provide more evidence to support its theory of fraudulent concealment.[6] The Court agrees. "A premature decision on summary judgement impermissibly 'deprive[s] the plaintiffs of their right to utilize the discovery process to discover facts necessary to justify their

_____

[6] This motion for partial summary judgment was filed March 29, 2005. (Doc. 22). The responses and replies concluded on August 4, 2005. (Docs. 43, 47, 94, 106). Discovery ended on September 15, 2005 with the exception of a brief extension for expert discovery.

opposition to the motion.'" <u>Vining v. Runyon</u>, 99 F.3d 1056, 1058 (11th Cir. 1996)(quoting

<u>Snook v. Trust Co. of Georgia Bank of Savannah, N.A.</u>, 859 F.2d 865, 871 (11th Cir. 1988).

Accordingly, defendant's motion for partial summary judgment as to Count I is **DENIED** as

premature.


## IV.  COUNT II

Defendant argues that it is entitled to summary judgment on Count II, plaintiff's claim for

money had and received, because defendant did not hold and was not unjustly enriched by any

money belonging to plaintiff or its insured SCI/Radney. (Doc. 22, p.11-13).  Defendant asserts

that it acted as a "pass-through" for the funds in its normal business operations but did not

"hold" them and has no current possession (alleging that Howe's accounts have been empty

since June 10, 2002). (Doc. 22, p.12).  Defendant also asserts that there is no evidence it was

enriched. (<u>Id.</u>)

Defendant relies in part on <u>Hancock-Hazlett Gen'l Constr. Co. v. Trane Co.</u>, 499

So. 2d 1385 (Ala. 1986) which held:

> The essence of theories of unjust enrichment or money had and received is that a
> plaintiff can prove facts showing that defendant holds money which, in equity and
> good conscience, belongs to plaintiff or holds money which was improperly paid
> to defendant because of mistake or fraud.

<u>Id.</u> at 1387.  Defendant also relies on <u>Azalea City Motels, Inc. v. First Alabama Bank of

Mobile</u>, 551 So.2d 967 (Ala.1989) which states that the claim of money had and received

"'lies wherever one has received and holds money which in good conscience belongs to

another'".  <u>Id.</u> at 977 (quoting <u>Christie v. Durden</u> 88 So. 667, 668 (Ala. 1921).

Plaintiff responds that the claim of money had and received in the banking context does

8

not require that defendant "hold" or "retain" the proceeds nor be "unjustly enriched" but instead, following a theory of restitution, defendant "became liable for money had and received by accepting and collecting the proceeds of the fraudulent checks under circumstances where its own employees should have suspected fraudulent activity and made inquiry to avoid the loss." (Doc. 43, p. 17-19).   In support of this proposition plaintiff points to three Alabama cases from 1932 and 1934 wherein the Court did not require that the defendant still "hold" the money in order to be liable for money had and received.  Rudisill Soil Pipe Co. v. First Nat'l Bank, 140 So. 569 (Ala. 1932); A. Paul Goodall Real Estate & Ins. Co. v. North Birmingham American Bank, 144 So. 7 (Ala. 1932); Citizens' Bank of Fayette v. J. Blach & Sons, 153 So. 404 (Ala. 1934).   Plaintiff further argues that in check fraud cases a bank would never "retain" the funds or be "unjustly enriched" because the principal, i.e., Howe, would generally transfer funds out of the defendant bank soon after the fraudulent deposit. (Doc. 43, p.20).

Plaintiff argues in the alternative that if plaintiff is required to show that defendant presently holds the money, that "facts are in dispute whether Compass retains any of Howe's funds".  (Doc. 43, p. 21).  Specifically, plaintiff states that Howe held several accounts at defendant Compass Bank and not all accounts have been closed and that "discovery is needed to investigate these post-March 2002 account transactions". Id.

While it appears that there may be a conflict in Alabama law on this issue, the Court need not decide the elements of money had and received in this order.  This is true because even if defendant's interpretation is correct, there is apparently a factual dispute over whether defendant continues to "hold" money that belongs to the plaintiff.  As with Count I,  "[a] premature decision on summary judgement impermissibly 'deprive[s] the plaintiffs of their right to utilize

the discovery process to discover facts necessary to justify their opposition to the motion.'"

<u>Vining,</u> 99 F.3d at 1058.  Accordingly, the defendant's motion for summary judgment as to

Count II is **DENIED** as premature.


## V.  COUNT III, Aiding and Abetting Breach of Fiduciary Duty

Defendant argues that Alabama law does not recognize a cause of action for aiding and

abetting breach of fiduciary duty and thus it is entitled to summary judgment as to Count III.

(Doc. 22, p.13-14).

Plaintiff responds that this cause of action is available under Alabama common law

although the legal standard has not been discussed.  (Doc. 43, p. 23)   Plaintiff cites to <u>Shades</u>

<u>Ridge Holding Co., Inc. v. Cobbs, Allen & Hall Mortg. Co. Inc.,</u> 390 So.2d 601 (Ala. 1980)

wherein the Court stated as follows:

> The case proceeded to trial on counts one, two, four, and eleven. Count thirteen,
> added during trial, in essence restated claims for fraudulent misrepresentation and
> nondisclosure which were already the subject of other counts.  The claims against
> South which were tried were based on: (1) its aiding and abetting Sandner in
> violating a fiduciary obligation he owed Shades Ridge[.]"

<u>Id.</u> at 604.  Plaintiff argues that this reference to aiding and abetting a fiduciary breach

establishes that Alabama recognizes such a civil cause of action.  Plaintiff also cites <u>Riles v.</u>

<u>Coston-Riles Lumber Co.,</u> 95 So. 43 (Ala. 1922), a case in which a claim for aiding and abetting

a fraud was asserted by plaintiff and then discussed by the Court.  Plaintiff argues that the claim

in <u>Riles</u> is analogous to aiding and abetting a breach of fiduciary duty and thus the Court can rely

on <u>Riles</u> to declare that aiding and abetting is a cognizable claim under Alabama law. (Doc. 43).

Plaintiff also argues that since there is no Alabama law establishing the elements of such

a claim that the Court should look to the Alabama Uniform Commercial Code to piece together the elements.  Specifically, plaintiff points to Ala. Code §7-3-307(b)[7] to assist the Court in determining what notice or knowledge the defendant must have in order to be found liable for "aiding and abetting a fiduciary breach". (Id. at p.24).

The Court must apply the laws of the State of Alabama but it does not have the authority

---

[7] "(a) In this section:  (1) "Fiduciary" means an agent, trustee, partner, corporate officer or director, or other representative owing a fiduciary duty with respect to an instrument.

(2) "Represented person" means the principal, beneficiary, partnership, corporation, or other person to whom the duty stated in subdivision (1) is owed. (b) If (i) an instrument is taken from a fiduciary for payment or collection or for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty, the following rules apply:

(1)     Notice of breach of fiduciary duty by the fiduciary is notice of the claim of the represented person.
(2)     In the case of an instrument payable to the represented person or the fiduciary as such, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, or (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary.
(3)     If an instrument is issued by the represented person or the fiduciary as such, and made payable to the fiduciary personally, the taker does not have notice of the breach of fiduciary duty unless the taker knows of the breach of fiduciary duty.
        4) If an instrument is issued by the represented person or the fiduciary as such, to the taker as payee, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, or (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary.

Ala. Code § 7-3-307.

to make the laws. <u>Beasley v. Fairchild Hiller Corp.</u>, 401 F.2d 593, 596 (5th Cir. 1968).[8]  The

Court has been unable to find any substantial support for the plaintiff's argument that the

common law tort of aiding and abetting a fiduciary breach exists under Alabama law.  Unlike

other states, it does not appear that Alabama recognizes the claim of aiding and abetting common

law torts.  <u>See</u> <u>Amerifirst Bank v. Bomar</u>, 757 F. Supp.1365, 1380 (S.D. Fla. 1991).  With the

exception of <u>Riles</u>, which is discussed *infra,* the Court has not found nor has the plaintiff cited

any authority that Alabama generally recognizes the claim of aiding and abetting a common law

tort.  When aiding and abetting is discussed in Alabama cases it is almost exclusively in the

context of a criminal case or in reference to a specific civil statutory provision.

However, whether Alabama generally recognizes the claim of aiding and abetting a

common law tort is not the issue to be decided.  Rather the question is whether Alabama

specifically recognizes the claim of aiding and abetting a breach of fiduciary duty. As stated

*supra*, plaintiff points to <u>Shades Ridge</u> for support.  In <u>Shades Ridge</u> the Court neither discussed

nor recognized the cause of action of aiding and abetting a breach of fiduciary duty.  Instead the

Court merely recounted the plaintiff's claims at trial which included aiding and abetting a

fiduciary breach.[9]  A single reference in one case is not sufficient to find that a cause of action

---

[8] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. <u>Bonner v. City of Prichard, Alabama</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

[9]The <u>Shades Ridge</u> Court stated that "[t]he claims against South which were tried were based on: (1) its aiding and abetting Sandner in violating a fiduciary obligation he owed Shades Ridge[.]" <u>Id.</u> at 604.  In regard to South, the trial court held that "there was no fiduciary relationship between Sandner and Shades Ridge in connection with the project", and subsequently held that

South was guilty of fraud because when Haralson received and diverted part of

12

exists under Alabama law. Preskitt v. Lyons, 865 So.2d 424, 427-429 (Ala. 2003).

Plaintiff offers the Eleventh Circuit's decision in Allison v. Vintage Sports Plaques, 136 F.3d 1443 (11th Cir. 1998) as guidance for determining when a cause of action exists although it may not have previously been identified. In Allison, plaintiff brought a "violation of the right of publicity" claim under the common law and the Eleventh Circuit held as follows:

> Alabama has not denominated the interest protected by its commercial appropriation invasion of privacy tort as the right of publicity. See McCarthy, Rights of Privacy and Publicity at § 6.1[B] (noting that sixteen states judicially or statutorily have recognized the right of publicity, denominated as such, and that an additional nine states have statutes that cover most aspects of the right of publicity). We read Alabama's commercial appropriation privacy right, however, to represent the same interests and address the same harms as does the right of publicity as customarily defined. Indeed, the elements of Alabama's commercial appropriation invasion of privacy tort, which bases liability on commercial, rather than psychological, interests, cf. McCarthy, McCarthy on Trademarks and Unfair Competition § 28:6, do not differ significantly from those of the tort of violation of the right of publicity. Compare Kyser-Smith v. Upscale Communications, Inc., 873 F.Supp. 1519, 1525-27 (M. D. Ala.1995), with Montana v. San Jose Mercury News, Inc., 34 Cal. App.4th 790, 793, 40 Cal. Rptr.2d 639, 640 (1995). As a technical matter, then, we construe appellants' claim as one sounding in commercial appropriation, rather than in publicity, although we conclude that the distinction is largely semantic.FN7

> > FN7. Because we conclude that there is no significant difference between Alabama's commercial appropriation privacy tort and the right of publicity, we use the terms interchangeably during the remainder of the opinion.

Id. at 1447. The Eleventh Circuit noted that the Alabama Supreme Court "has addressed the tort of commercial appropriation only twice" and thus had provided "little guidance in determining the contours of the cause of action[.]" Id. However, the Eleventh Circuit was able to "read

---

> the funds he was South's executive vice-president and it had placed him in a position where he was able to engage in the fraudulent conduct[.]

Id. at 604.

Alabama law" and determine the elements to be proven in order to prevail on the count.  In Allison, the Eleventh Circuit found the case law sufficient to aid the Court in addressing the claim and determining that it exists under Alabama law but "as one sounding in commercial appropriation, rather than in publicity".  Id.

The Court does not find Allison helpful in this case.  First, the "analogous" cause of action relied upon by plaintiff from Riles is not analogous.  Aiding and abetting a fraud does not "represent the same interest and address the same harms" as aiding and abetting a breach of fiduciary duty.  Allison at 1447.   What plaintiff requests of this Court differs significantly from Allison wherein the Eleventh Circuit acknowledged the existence of a cause of action denominated differently from that found in Alabama law, but both sustained on the same interest and same harm analysis.  Identifying a cause of action set forth by a different name or phrase is not the same act as creating a new cause of action under Alabama common law and then creating the necessary elements to sustain the new cause of action.

In sum, the Court has not found case law sufficient to aid the Court in addressing the claim or determining that its exists under Alabama law.  Plaintiff has argued that this Court should look to the Alabama Uniform Commercial Code to help define the common law cause of action.  This would not be appropriate because if aiding and abetting a fiduciary breach exists at common law, its elements should be ascertained from common law.

Accordingly, because Alabama law does not recognize the common law cause of action of "aiding and abetting breach of fiduciary duty, the defendant's motion for summary judgment as to  Count III, which this Court is treating as a motion to dismiss for failure to state a claim, is **GRANTED**.

**VI.  COUNT IV, plaintiff's claim for conversion facilitating breach of fiduciary duty**

Defendant argues that plaintiff's claim of conversion facilitating a breach of fiduciary duty is not recognized under Alabama law. (Doc. 22).  Defendant also argues that if plaintiff's claim is brought under common law conversion, then plaintiff may not recover because common law conversion has been displaced by Ala. Code § 7-3-420 and that section precludes an issuer from bringing a conversion action. (Doc. 22).

Plaintiff responds that it has not alleged a conversion claim under Ala. Code § 7-3-420 but under the common law and thus, issuer preclusion does not apply. (Doc. 43).  Plaintiff argues that while support for a common law claim of conversion facilitating a breach of fiduciary duty is not evident in the case law of Alabama, there is support in the treatise of White & Summers which contemplates a claim for common law conversion within the context of breach of fiduciary duty under UCC § 3-307. See 2 White & Summers, § 19-5(b) at 273-276. (Doc. 43).

Plaintiff also responds that its claim has not been displaced by Ala. Code § 7-3-420, which addresses statutory conversion under the UCC, because its claim is a separate, common law claim for conversion facilitating breach of fiduciary duty.  Moreover, plaintiff points out that Alabama courts have recognized claims for conversion outside of the statute and that the "claim, based on long-standing common law, does not remotely overlap, conflict with, share elements of, or in any way depend on statutory conversion." (Doc. 43).

Plaintiff requests that this Court create a cause of action under Alabama substantive law and in so doing, relies upon the opinions of White & Summers which is a treatise, not Alabama law.  Plaintiff further argues that Alabama case law supports a claim of common law conversion beyond the Alabama Commercial Code and relies upon AmSouth Bank, N.A. v. Reliable

15

Janitorial Service, Inc., 548 So.2d 1365, 1368 n.2 (Ala. 1989) which addressed the predecessor to Ala. Code § 7-3-420 (Ala. Code § 7-3-419).  However, AmSouth Bank, N.A. v. Reliable Janitorial Service, Inc. did not address or recognize a common law claim for conversion facilitating breach of fiduciary duty.   Rather, AmSouth Bank, N.A. v. Reliable Janitorial Service, Inc, interpreting the former provision, noted that Ala. Code § 7-3-419 did not address the factual situation alleged where a depositary bank accepted fraudulently altered deposits and therefore the depositary bank may be liable for conversion.  The Court further recognized that Ala. Code § 7-3-419 did not cover all situations involving depositary banks such that under Ala. Code § 7-3-103, common-law conversion may still be available.  As this holding was completely based on the prior version of Ala. Code § 7-3-419, which has changed substantially, it provides no support that common-law conversion is available to the plaintiff under the facts alleged in this case.

        Plaintiff also cites to Strickland v. Kafko Mfg., Inc., 512 So2d 714, 716 (Ala. 1987) in support of its argument that it has met the elements of a common law conversion claim. However, Strickland did not address or recognize a common law claim for conversion facilitating breach of fiduciary duty.  Moreover, the statement is Strickland that a "negotiable instrument may be subject to a conversion claim outside the provision of § 7-3-419 [the predecessor to Ala. Code § 7-3-420]", obviously refers to situations not already covered by the commercial code.

        As previously stated, the Court has an obligation to apply the laws of the State of Alabama but it does not have a duty to make the laws. Beasley, 401 F.2d at 596.  Plaintiff has not provided any case law from which this Court might attempt to extrapolate a cause of action

16

for conversion facilitating a breach of fiduciary duty.  Accordingly, the undersigned finds that

the laws of Alabama do not delineate a common law cause of action for conversion facilitating

breach of fiduciary duty.  Moreover, if plaintiff's complaint is construed to be asserting a simple

common law conversion claim, which is recognized in Alabama, plaintiff  fails to state a cause

of action.   A conversion claim by an issuer against a depositary bank has been displaced by the

Alabama Commercial Code and under the code the issuer (drawer)[10] is explicitly excluded from

bringing such a conversion claim. Ala. Code § 7-3-420  There is no dispute that SCI/Radney was

the issuer of the checks and that Continental has no rights greater than SCI/Radney.

The Official Comment to Ala. Code §7-3-420 explains the section as follows:

> The first sentence of Section 3-420(a) states a general rule that the law of
> conversion applicable to personal property also applies to instruments.... This
> [second sentence of 3-420(a)] covers cases in which a depositary or payor bank
> takes an instrument bearing a forged indorsement....
> Under former Article 3, the cases were divided on the issue of whether the
> drawer of a check with a forged indorsement can assert rights against a depositary
> bank that took the check.  The last sentence of Section 3-420(a) resolves the
> conflict ....  There is no reason why a drawer should have an action in conversion.
> The check represents an obligation of the drawer rather than property of the
> drawer.

Id. at Comment 1.

The Alabama Supreme Court has explained displacement by the Alabama Uniform

Commercial Code as follows:

> Whether a statutory provision has 'displaced' a common-law cause of action
> under §7-1-103 will depend to a great degree on (1) the levels of identity
> between, and specificity of, both the common-law cause of action being asserted
> and the statutory provisions, and (2) the extent to which the statutory language
> evidences that the provision's scope of operation affirmatively excludes a
> necessary basis for the common-law cause of action....  Under §7-3-103, when a

---

[10] Issuer is defined as "a maker or drawer of an instrument".  Ala. Code  §7-3-105(c).

statute provides a cause of action relating to a specific factual situation in a specific manner, then any common-law cause of action based upon a factual situation so materially identical that it is clearly within the specific scope of the provision must be said to have been "displaced," especially if it is in some way affirmatively excluded by the statutory language.

American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786, 794-795 (Ala. 2002).    The language of Ala. Code §7-3-420 clearly excludes the issuer (drawer) of a check from bring a conversion claim.  The Official Comment explains why the issuer does not have a claim for conversion against the depositary bank when it states "the check represents an obligation of the drawer rather than property of the drawer".  Off. Cmt 1 to Ala. Code §7-3-420.  Thus, it is clear that the common-law action for conversion against a drawer is within the "specific scope of the provision" and the legislature has clearly stated that no such action exists for the issuer of the check.

Accordingly, because the plaintiff has failed to state a cause of action under Alabama law the defendant's motion for summary judgment on Count IV, which this Court is treating as a motion to dismiss for failure to state a claim, is **GRANTED**.

**VII.  PUNITIVE DAMAGES[11]**

Defendant moves for summary judgment on the plaintiff's claim for punitive damages. Specifically, the defendant argues that punitive damages are not available under the Alabama Uniform Commercial Code.  Defendant further asserts that in any case claims for punitive damages are not assignable.

The plaintiff responds that it is entitled to punitive damages under Ala. Code

---

[11]The plaintiff has withdrawn its' request for punitive damages as to Count II. (Doc. 260).

§6-11-20(b)(2) for conduct "carried on with a reckless or conscious disregard for the rights or safety of others."   Plaintiff argues that defendant's reliance on AmSouth Bank, N.A. v. Spigener, 505 So.2d 1030, 1033 (Ala. 1986) is misplaced because AmSouth Bank, N.A. v. Spigener addressed Article 4 of the Alabama Commercial Code, which applies to the contractual bank-customer relationship, but it does not address Article 3.  Specifically, plaintiff argues that AmSouth Bank, N.A. v. Spigener does not address the operative issue of whether punitive damages are permitted under statutory negligence pursuant to Ala. Code §§ 7-3-405-406. Plaintiff states that its claim for statutory negligence is a tort claim and that punitive damages are permitted for torts. Ala. Code § 6-11-20(a).  Plaintiff points out that punitive damages have been applied in UCC cases in other jurisdictions.

Ala. Code § 7-1-106(1) provides that "[n]either consequential or special nor penal damages may be had except as specifically provided in this Title or by other rule of law." Moreover, Ala. Code § 7-1-103 provides in part that "[u]nless displaced by the particular provisions of this title, the principles of law and equity,... shall supplement its provision. American Liberty Ins. Co., explains this provision as follows:

> Under §7-3-103, when a statute provides a cause of action relating to a specific factual situation in a specific manner, then any common-law cause of action based upon a factual situation so materially identical that it is clearly within the specific scope of the provision must be said to have been "displaced," especially if it is in some way affirmatively excluded by the statutory language.

825 So.2d at 794-795.

In Count I, plaintiff bring its claims pursuant to Ala. Code §7-3-405 and §7-3-406.[12]

---

[12] Plaintiff has conceded that it is not pursuing its' claim under Ala. Code §7-3-404. See fn. 4, *supra.*

"Section 3-405 is addressed to fraudulent indorsements made by an employee with respect to instruments with respect to which the employer has given responsibility to the employee.  It covers... indorsements made in the name of payees of instruments issued by the employer." Off. Cmt. 1 to <u>Ala</u>. <u>Code</u> §7-3-405.[13]   Also, <u>Ala</u>. <u>Code</u> §7-3-405 specifically provides that "[i]f the person... taking it ... for collection fails to exercise ordinary care in... taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss." <u>Ala</u>. <u>Code</u> §7-3-406 addresses the allocation of loss resulting from the negligence contributing to forged signatures on instruments.  The Official Comment 1 to <u>Ala</u>. <u>Code</u> §7-3-406 notes that "[s]ection 3-406 does not make the negligent party liable in tort for damages resulting from the alteration".

Thus, because the code sections address a specific factual situation and the same factual situation is alleged in this case, the commercial code's statutory provisions displace common-law claims. <u>American Liberty</u>, 825 So. 2d at 794-795.  In <u>C & N Contractors, Inc. v. Community Bancshares, Inc.</u>, 646 So.2d 1357, 1362 (Ala. 1994), the Alabama Supreme Court stated that [the previous version of] § 7-3-405 "appears to displace an action for common law negligence or wantonness ...."[14]  Section 3-405 has been revised to the extent that it includes a wider scope of

---

[13] The Official Comment is not controlling authority but is an indication of the intent of the drafter. <u>Fitts v. AmSouth Bank,</u> 917 So.2d 818, 824 (Ala. 2005).

[14] A federal court sitting in diversity must follow statements of law expressed by the state supreme court, even those expressed in dicta.  <u>Towne Realty, Inc. v. Safeco Ins. Co. of America</u>, 854 F.2d 1264, 1269 n. 5 (11th Cir.1988).

factual situations.  Official Comment 1 to <u>Ala</u>. <u>Code</u> §7-3-405 states, "Section 3-405 includes cases that were covered by former Section 3-405(1)c).  The scope of Section 3-405 in revised Article 3 is, however, somewhat wider."

Thus, it is evident that the Supreme Court of Alabama would view the enactment of  <u>Ala</u>. <u>Code</u> §7-3-405 as a displacement of claims factually covered by <u>Ala</u>. <u>Code</u> §7-3-405 that could have been brought under <u>either a negligence or wantonness theory</u>.  In sum, plaintiff's cause of action is limited to the Alabama Commercial Code.  The bases for plaintiff's claim of punitive damage recovery, reckless and wanton conduct and conscious indifference, have been displaced by <u>Ala</u>. <u>Code</u> § 7-3-405.  Accordingly, as a matter of law the plaintiff cannot recover punitive damages for the alleged violation of <u>Ala</u>. <u>Code</u> § 7-3-405 and §7-3-406, and thus summary judgment on the claim for punitive damages is **GRANTED.**

## VIII.  CONCLUSION

The Court finds that defendant's motions for partial summary judgment as to Count I and for summary judgment as to Count II are premature as discovery was not completed at the time the motions were filed and responses made.  Therefore, defendant's motion for partial summary judgment as to Count I is **DENIED** and defendant's motion for summary judgment as to Count II is **DENIED.**

The Court further finds that defendant's motion for summary judgment as a matter of law

as to Count III, Count IV and the claim for punitive damages is due to be and is **GRANTED.**

**DONE** and **ORDERED** this the 4th day of March, 2006.

 s / Kristi K. DuBose 
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**