IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CONTINENTAL CASUALTY ) | |
| COMPANY, ) | |
| ) | |
|       Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO 04-0766-KD-C |
| ) | |
| COMPASS BANK, ) | |
| ) | |
|       Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

On December 1, 2004, Continental Casualty Company (Continental) filed this subrogation action against Compass Bank (Compass) to recover $915,971.00 paid by Continental to its insured SCI Corporation as a result of an embezzlement scheme conducted at the central accounting office for four funeral homes owned and operated by SCI. This matter is before the court on the defendant's motion for partial summary judgment and supporting memorandum wherein defendant argues that it is entitled to partial summary judgment as to count 1, Lack of Ordinary Care and Good Faith, to the extent that it is predicated upon Code of Alabama § 7-3-406 because the statute does not create an affirmative cause of action. (Docs. 70, 71), Plaintiff's response (Doc. 83), and Defendant's reply (Doc. 87). As set forth in detail below, upon consideration of all matters presented, and after reviewing the record in a light most favorable to the plaintiff, [1] the Court determines that the defendant's motion for partial summary

---

[1] The Court, when ruling on a motion for summary judgment, "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir. 2004) (citations omitted)

judgment (Doc. 70) is due to be **GRANTED**.

I.      **Factual Background**

1. Service Corporation International (SCI) owned and operated four funeral homes in the Mobile, Alabama including Radney Funeral Home on Dauphin Street. Continental Casualty Company (Continental) is the fidelity insurer of SCI. (Doc. 1).

2. For twelve years, Vivian Elaine Howe (Howe) was employed by SCI as an Accounting Center Insurance Processing Clerk at SCI's Mobile Accounting Center (MAC) located at Radney. (Doc. 1). Howe's job duties included processing insurance claims and receiving insurance payments from Brown Services,[2] a pre-arranged funeral insurance provider. (Doc. 1, Doc. 71, Exhibit B, SCI internal memorandum of April 26, 2002).[3]

3. From June 1996 until March 2002, Howe embezzled approximately $915,971.00 from SCI. Her actions were described as follows in an SCI internal audit memorandum:

> Ms. Howe would select at-need accounts which were paid-in-full or several months old with minimal outstanding balances. She then created fake Brown Services policy numbers for the customers and submitted fraudulent claim documents to the Accounting Center Accounts Payable Clerk making it appear the customers had a Brown Services preneed insurance policy. The fake claim documents were never submitted to Brown Services. Ms. Howe obtained the refund checks, forged customer signatures on the checks and cashed the checks. A significant number of the checks were cashed at Compass Bank.
>
> Ms. Howe had been caught cashing customer refund checks in 1999 and again in 2000. Ms. Howe was given a verbal warning in 1999 and a written reprimand in 2000 which stated she would be terminated if she cashed another refund check.

---

[2] Howe, SCI and Brown Services are not parties to this lawsuit. (Doc. 1).

[3] The Exhibit is missing one page. However, the full text of the internal memorandum is found at Document 22-1, Exhibit B).

Both times Ms. Howe stated she had cashed the checks at the customer's request. Neither incident was reported to Region Management and a detailed review of Ms. Howe's activities was not performed.

. . .

This investigation was initiated as a result of two incidents which occurred at the [MAC] in March 2002.  Mr. Torston, Funeral Director, requested Betty Mill, Accounting Center Manager, investigate a customer refund check which the family stated had not been received.  Ms. Mills orders a copy of the cancelled check from the Houston Bank Reconciliation Department and found it have been cashed by Ms. Howe.  Ms. Mills and Kenneth Hart, Location Manager, met and agreed to terminate Ms. Howe since she had been give a verbal warning in 1999 and a written reprimand in 2000 not to cash any more customer refund checks.  Ms. Howe was terminated on March 11, 2002.  About a week later, Mr. Hart was following up on a Customer Satisfaction Survey comment when he found a copy of a customer refund check in the file.  The file contained a Brown Services Certification Form but did not contain a copy of the Brown Services Policy.  Mr. Hart asked Carol Dorgan, Accounts Payable Clerk, to order a copy of the canceled check from the Houston Bank Reconciliation Department.  When the check arrived, Mr. Hart found Ms. Howe had cashed the check.  Mr. Hart subsequently obtained eleven other canceled checks totaling $8,172, which had been cashed by Ms. Howe.

. . .

Brown Services is a preneed funeral insurance provider exclusive to Alabama residents.  Retail values on Brown Services policies generally range from $100 to $800.  SCI contracts with Brown Services to provide funeral services for Brown Services policyholders.  SCI provides the funeral service and then invoices Brown Services for the insurance proceeds.  It is SCI's practice to refund a customer the value of the Brown Services policy when services have been provided and paid for prior to the family becoming aware of an existing Brown Services policy.

To obtain reimbursement from Brown Services, SCI submits a Certification Form (Brown Services form #156-2-66-25M, certifying the deceased name, policy number and date of death) and an Invoice (Brown Services form #FH69-1000 BKS).  Brown Services reimburses SCI monthly for funeral invoiced during the month.  The reimbursements from Brown Services do not contain detail policyholder or payment information.

Prior to the September 2000 incident, if a customer refund was required, Ms. Howe only had to submit an SCI Adjustment to Accounts Receivable Form and a copy of the adjusted customer statement from the location's account receivable package to Ms. Mills for approval.  The approved documents would be forwarded to an Accounts Payable Clerk for issuance of the refund check.  The Accounts

>Payable Clerk would return the check to Ms. Howe for mailing to the customer.
>
>After the September 2000 incident, Ms. Howe had to submit the Brown Services Certification Form, Brown Services invoice and the SCI Adjustment to Accounts Receivable Form to Ms. Mills for approval.  The approved documents would be forwarded to an Accounts Payable Clerk for issuance of a refund check.  The Accounts Payable Clerk was instructed to mail the check and not return it to Ms. Howe.  Ms. Howe retrieved the refund checks from the mailbox before the courier took the mail to the post office.  When a new Account Payable Clerk was hired [,] Ms. Howe obtained the checks from the new Accounts Payable Clerk.
>
>For the period 1997 to March 2002, Brown Services provided us with a report of payments made to the [MAC].  The report contained the name of the insured, policy number, and date paid.  Location copies of the Brown Services Invoices and SCI customer rebate check stubs were traced to the Brown Services report.  We found 869 refund checks which had been issued based on fraudulent Brown Services documentation.  Copies of the cancelled checks obtained from the Houston Bank Reconciliation Department revealed the checks had been cashed by Ms. Howe.
>
>For 1996, we obtained a Check Distribution Report provided by the Accounting Center Manager.  Copies of cancelled checks were obtained from the Houston Bank Reconciliation Department for refunds between $400 and $1000 issued from June to December 1996.  June 1996 was the last month SCI had checks available on the CD's from the bank.  We found 124 checks which had been cashed by Ms. Howe.
>
>We also obtained an AS400 Accounts Payable System report of disbursements made by the Accounting Center for Laotians 4201, 4405, 4406 and 4959 during the period 1998 to March 2002 (disbursements prior to 1998 were not listed on the Accounts Payable System).  Based on a review of the report 3,331 customer refund checks were issued during the period.  Copies of cancelled checks were obtained from the Houston Bank Reconciliation Department for refunds between $400 and $800 which were not included in the Brown Services report testing.  We found an additional 240 refund checks which had been cashed by Ms. Howe.

(Doc. 71, Exhibit B, SCI memorandum of April 26, 2002).   The memorandum also referenced a "list of procedures which should be in place to control third party reimbursements" and that during the investigation, the investigator determined that these controls were not in place at the MAC. (Id. at pg. 2).

4. Howe deposited most if not all of the checks into her accounts at Compass Bank. (Doc. 1, Doc. 70, Exhibit A).

5. The embezzlement was discovered by SCI/Radney in March 2002, (Doc.1).

6. Plaintiff insured SCI/Radney under a commercial crime policy, and on April 11, 2003, SCI/Radney was compensated by Plaintiff in the amount of $915,971.00 less a $100,000.00 deductible, pursuant to a Partial Payment Agreement and Assignment of Claims for Howe's embezzlement. SCI/Radney assigned its rights, title, and interest in all monies that might be recovered to Plaintiff. (Doc. 1).

## II.    **Summary Judgment Standard**

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id. "If the nonmoving party fails to makes 'a sufficient showing

---

[4] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986))(footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 534 U.S. 1081,125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

      With this legal framework in mind, the court now turns to the specific grounds upon which defendant bases its motion for summary judgment.

**III.  Discussion**

      Defendant argues that it is "entitled to partial summary judgment as a matter of law with respect to Count 1 of the Complaint, Lack of Ordinary Care and Good Faith, to the extent it is predicated upon Alabama Code § 7-3-406" because the statute "does not create an affirmative cause of action." (Doc. 71, p. 3).  Specifically, defendant argues that the text of the statute does not create an affirmative cause of action but instead creates a defense which it may assert when plaintiff's negligence contributes to a forgery.

6

Defendant also points out that in cases decided before the 1995 amendment to the statute, the Supreme Court of Alabama repeatedly recognized that Ala Code §7-3-406 creates a defense but has not found that it provides a cause of action. Union Bank & Trust Co. v. Elmore County Nat. Bank, 592 So.2d 560 (Ala. 1991); AmSouth Bank, N.A. v. Reliable Janitorial Service, Inc., 548 So.2d 1365 (Ala. 1989); Al Sarena Mines, Inc. v. SouthTrust Bank of Mobile, 548 So.2d 1356 (Ala. 1989); J. Gordon Neely Enterprises, Inc., v. American Nat. Bank, 403 So. 2d 887, 891 (Ala. 1981).

Noting that no Alabama case has held that the current Ala. Code §7-3-406 creates a cause of action, defendant relies upon Halifax Corp.v. Wachovia Bank, 604 S.E. 2d 403 (Vir. 2004), which addressed and rejected the same argument based on Virginia Commercial Code sections identical to the Alabama Commercial Code sections at issue.  Defendant points out that Ala. Code § 7-3-406 does not contain the phrase "cause of action", "may recover" or any language that could be interpreted as creating a cause of action as does Ala. Code § 7-3-404 and 7-3-405, thus the "plain meaning rule" of statutory construction should be applied. Halifax, 604 S.E. 2d at 408.  Defendant references the court's determination in Halifax that if the Virginia Assembly had intended the language creating a cause of action, such as "may recover",  to be part of Ala. Code § 7-3-406, then they would have included it as they did in Ala. Code §§ 3-404 and § 3-405 and argues that the same can be said for the Alabama Legislature.  See also White Sands Forest Products, Inc. v. First National Bank of Alamagordo, 50 P. 3d 202 (N.M. Ct. App. 2002). Defendant also points out that language in the comment states that the code section does not create a negligence cause of action. (Doc. 71).

Plaintiff replies that the overwhelming majority rule is that the statute creates an

affirmative cause of action and that defendant relies on two outlier decisions. Plaintiff argues that the revised UCC introduced the tort concept of a comparative negligence rule to the new commercial code in Article 3-404[5], 3-405, and 3-406, in other words, a "statutory negligence trilogy".(Doc. 83). Plaintiff refers to Ala. Code § 7-3-406 as a "general comparative negligence provision" and explains that former Ala. Code § 7-3-406 provided a contributory negligence defense by which the bank must act in accordance with reasonable commercial standards or be responsible for the full loss. (Doc. 83)

Plaintiff argues that Ala. Code § 7-3-404, § 7-3-405, and § 7-3-406, all provide a cause of action. Plaintiff points out that the first two parts of the statutory negligence trilogy create new causes of action by stating that a plaintiff "may recover" and that courts and commentary uniformly recognize the new causes of action. Gina Chin & Assocs. V. First Union Bank, 500 S.E. 2d 516 (Va. 1998). (Doc. 83). Plaintiff argues that Ala. Code § 7-3-406 "introduces the same comparative negligence and duty of care, and utilizes the phrase 'loss is allocated' rather than 'may recover'" and that courts and commentators have recognized that it too creates a cause of action. (Doc. 83).[6]

---

[5] The plaintiff's claim under Ala. Code § 7-3-404 were dismissed in a prior order.

[6] "Most courts to date, and leading commentators, hold or conclude it creates a cause of action. See Olympic Title Ins. Co. v. Fifth Third Bank of Western Ohio, No. 20145, 2004 Ohio App. LEXIS 4795 *20 (Ohio App. Sept. 10, 2004) (noting "numerous courts and commentators have interpreted UCC 3-406 as providing not only a defense to liability but an affirmative claim" which "may provide a cause of action for negligence under certain circumstances"); Nat'l Union Fire Ins. Co. v. Hibernia Nat'l Bank, 258 F. Supp. 2d 490, 493-94 (W.D. La. 2003); Nat'l Union Fire Ins. Co. v. Allfirst Bank, 282 F. Supp. 2d 339, 346 (D. Md. 2003), affirmed, No. 03-2276, 2005 U.S. App. LEXIS 4757 (4th Cir. March 23, 2005); Micro Experts, Inc. v. Edison Tech., Inc., 701 N.E.2d 1033, 1039-40 (Ohio App. 1997); Atlantic Mut. Ins. v. Provident Bank, 669 N.E.2d 901, 903-04 (Ohio Mun. 1996). In New Jersey, an appeals court implicitly held 3-406 provides a claim against a drawee, Travelers Indem. Co. v. Good, 737 A.2d 690, 692-94 (N.J.

**IV. Analysis**

The court first notes that all commentary and illustrations to Ala. Code § 7-3-406 discuss the statute in terms establishing preclusion or of its availability as a defense. Official Comment 3, Ala. Code § 7-3-406. Also, no Alabama case has addressed Ala. Code § 7-3-406 since the 1995 amendments. Cases which addressed the predecessor to Ala. Code § 7-3-406 have discussed the statute in terms of creating a defense to other actions under the Alabama Commercial Code but not as creating an affirmative cause of action for negligence. The predecessor statute precluded recovery if the plaintiff contributed to the material alteration. The current version of Ala. Code § 7-3-406 provides for a comparative negligence standard.

In Union Bank & Trust Co. v. Elmore County Nat. Bank, 592 So.2d 560 (Ala. 1991), the Alabama Supreme Court discussed breach of warranty under Ala. Code § 7-4-207 and applying the prior code section, the court found as follows:

> Ala. Code 1975, § 7-3-406, provides the collecting bank a defense to a claim of breach of warranty under § 7-4-207. Section 7-3-406 states: "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." (Footnote omitted)
> . . .

---

App. 1999), and two unreported decisions expressly upheld a 3-406 claim against a depositary. Delta Textiles New York, Ltd. v. Diaz, No.: L-10646-01 (N.J. Super. Oct. 24, 2003); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Sun Nat'l Bank, No. MER-L-2894-03 (N.J. Super. Mar. 5, 2004). In each federal decision, the district courts flatly rejected the argument that 3-404, 3-405 and 3-406 provide only defenses and "no independent and free standing cause of action," Hibernia, 258 F. Supp. 2d at 493-94, despite the banks "strenuous" arguments to the contrary." (Doc. 83).

> Although the trial court discussed a number of facts that indicated negligence on the part of Union Bank, and although those facts might be found to have proximately caused the making of the forgery, **these facts can not establish the defense under Ala.Code 1975, § 7-3-406,** as a matter of law.

592 So.2d at 562-563 (emphasis added).  Also, addressing the prior code section in <u>AmSouth Bank, N.A. v. Reliable Janitorial Service, Inc.,</u> 548 So.2d 1365 (Ala. 1989), the Alabama Supreme Court again addressed this section in terms of providing a defense.

> **AmSouth's third issue concerns another defense the trial court disallowed,** Ala. Code 1975, § 7-3-406.  That section provides:
>
> "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."
>
> AmSouth contends that, under § 7-3-406, the jury could find that Reliable was negligent, then find that Reliable's negligence "substantially contribute[d] to a material alteration of the instrument." However, § 7-3- 406 by its terms requires that the material alteration must be to an instrument. Section § 7-3-102(1)(e) provides that " 'Instrument' means a negotiable instrument." In the present case, if there were material alterations, the "material alterations" would have been to deposit slips, not to the instruments themselves. Accordingly, AmSouth may not use § 7-3-406 as a defense. (Footnote omitted) (citation omitted)

548 So.2d at 1369 (Ala. 1989) (emphasis added).   In <u>Al Sarena Mines, Inc. v. SouthTrust Bank of Mobile</u>, 548 So.2d 1356 (Ala. 1989), the Court discussed the defense as follows:

> SouthTrust's asserted defenses hinge upon the question of whether it acted in a commercially reasonable manner in accepting the checks payable to Al Sarena for deposit into Stanton's personal account or into the Tab Sales account. This element of commercial reasonableness appears not only in § 7-3-419(3), quoted above, but also in § 7-3-406, . . .
>
> We note that there is some question as to whether the last clause of § 7-3-406, beginning with "or against a drawee or other payor," applies to SouthTrust at all. SouthTrust is not a "payor bank" as defined in § 7-4-105(b), nor is it a drawee. Although "drawee" is not defined in the commercial code, the drawee is the bank

10

> where the account on which the check is drawn is maintained. . . . Of course, if SouthTrust is not a "payor" within the meaning of § 7-3-406, **it would have to prove itself to be a holder in due course in order to avail itself of the defense of § 7-3-406.** In that case, the requirement that it took the checks "[w]ithout notice ... of any defense against" them, § 7-3-302(1)(c), would entail an analysis very similar to that below, in which we discuss the question of whether acceptance of a check to a corporate payee for deposit into a personal account without inquiry is commercially unreasonable as a matter or law. Because the parties tried the case under the theory that SouthTrust is a "payor" **and thus entitled to a § 7-3-406 defense** only if it acted in accordance with commercially reasonable standards, we shall treat that theory as the law of the case.

548 So.2d at 1358 -1359 (emphasis added); See also AmSouth Bank, N.A. v. Spigener, 505 So.2d 1030, 1033 (Ala. 1986) ("Spigener contends that the bank charged his account in bad faith and with notice that the completion was improper, which he says is contrary to reasonable commercial standards of the bank's business. AmSouth denies both allegations and has asserted in defense § 7-3-406").

A federal court sitting in diversity is required to apply the laws . . . of the state in which the federal court sits". Colonial Life and Accident Insurance Co. v. Hartford Fire Insurance Co., 358 F. 2d 1306, 1308 (11th Cir. 2004). Because the Alabama courts have not expressly stated that Ala. Code § 7-3-406 creates an affirmative cause of action for negligence, this court must determine whether the Alabama courts would interpret the statute in that manner. Plaintiff has presented cases wherein trial level courts have followed the opinion of White & Summers[7] and other treatises to find an affirmative cause of action for negligence. However, Alabama has clearly established rules of statutory construction which this court must follow.

In Hammonds v. Town of Priceville, 886 So.2d 67 (Ala. 2003), the Alabama Supreme

---

[7] 2 James J. White and Robert S. Summers, Uniform Commercial Code §19-1 at 239, 19-3 at 247, 248, 253 (4th ed. 1995),

Court stated as follows:

> When the language of a statute is clear and unambiguous, we must enforce the statute as written, thus giving effect to its plain meaning. Ex parte Pfizer, Inc., 746 So.2d 960, 964 (Ala.1999); DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275 (Ala.1998). However, if the language of a statute is ambiguous or if one statute conflicts with another, we must apply principles of statutory construction to determine the meaning of the statute. One such principle provides that statutes dealing with the same subject matter are to be construed in pari materia. (Footnote omittd) Tucker v. Molden, 761 So.2d 996, 998 (Ala.2000); Tuders v. Kell, 739 So.2d 1069, 1072 (Ala.1999); DeKalb County LP Gas, 729 So.2d at 276.

Id. at 69.   In Pfizer, the court explained the method applied by the Court as follows:

> "In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
>
>> " ' "Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect." '
>
> (Citations omitted)
>
> It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be.  Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997).

Ex parte Pfizer, Inc., 746 So.2d at 964 -965 quoting DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270 (Ala.1998).  Additionally, the law of statutory construction in Alabama was recently explained in Gartman v. Limestone County Bd. of Educ., 2005 WL 250837 (Ala. Civ. App. 2006) wherein the appellate court stated as follows:

12

> It is a well-settled rule of statutory construction that courts ascertain the Legislature's intent in enacting a statute from the language used in the statute itself, as well as from the reason for the statute and the goals the Legislature seeks to accomplish through the statute." Alabama Bd. of Pardons & Paroles v. Brooks, 802 So.2d 242, 247 (Ala. Civ. App.2001) (citing McGuire Oil Co. v. Mapco, Inc., 612 So.2d 417 (Ala.1992)).  Words used in a statute are to be given their natural, plain, ordinary, and commonly understood meaning. IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992).  "Further, it is well established that ' "[s]ections of the Code dealing with the same subject matter are in pari materia.  As a general rule, such statutes should be construed together to ascertain the meaning and intent of each."'" State v. Amerada Hess Corp., 788 So.2d 179, 183 (Ala. Civ. App.2000) (quoting New Joy Young Rest., Inc. v. State Dep't of Revenue, 667 So.2d 1384, 1387 (Ala. Civ. App.1995) (quoting in turn Locke v. Wheat, 350 So.2d 451, 453 (Ala.1977)) ). "In construing a statute, the court must consider the entire statute and not an isolated part, giving to every clause effect in light of the subject matter and purpose of the enactment." Standard Oil Co. v. State, 55 Ala. App. 103, 111, 313 So.2d 532, 539 (Civ.1975). "Statutory construction dictates that in construing a statute, a court must, if possible, avoid a construction that would place statutes in conflict with other statutes, and statutes should be resolved in favor of each other, when possible, so as to form one harmonious plan." Bryce Hosp. Credit Union, Inc. v. Warrior Dodge, Inc., 50 Ala. App. 15, 21, 276 So.2d 602, 607 (Civ.1973).

Id. at *2.

With this instruction, the court now turns to the statute, encaptioned "Negligence contributing to forged signature or alteration of instrument":

> (a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
>
> (b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
>
> (c) Under subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

13

Ala. Code § 7-3-406.

The plain language of the statute does not contain any words or phrases which can not be rationally interpreted thus this court need not "look beyond those words to determine legislative intent." Ex parte Pfizer, Inc, 746 So.2d at 965.  Giving the words "assertion" and "preclusion" their "commonly understood meaning" and presuming that the words mean "exactly what they say" the statute speaks to asserting that which will preclude or bar another person's action but not in terms of bringing an action.

In Hammond, the Alabama Supreme Court discussed the principle of statutory construction which provides "that statutes dealing with the same subject matter are to be construed in pari materia." Hammond, 886 So. 2d at 69 (citations omitted).   Viewed in conjunction with Ala. Code § 7-3-404 and 7-3-405 which specifically include the phrase "may recover" and which were enacted in the same 1995 Act as Ala. Code § 7-3-406, the court is persuaded by the absence of the language "may recover" which is present in the other sections. This court should assume the Legislature chose the words with care, and that when language is included in one statute but omitted from another, this court should presume the exclusion intentional. Underwood v. Medical Clinic Board, 2004 WL 3017027, 3-4 (Ala. 2004).

The court acknowledges that the Official Comment is not controlling authority but is an indication of the intent of the drafters. Fitts v. AmSouth Bank, 917 So.2d 818, 824 (Ala. 2005). Official Comment 1 contains no language from which a reasonable reader would conclude that the commentators implied or intended an affirmative cause of action not set forth in the statute. The comment speaks of a duty of care imposed on a drawer when issuing an instrument but does not identify an affirmative cause of action for breach of that generalized duty of care.  Also, the

14

comment states in precise language that "Section 3-406 does not make the negligent party liable in tort for damages resulting from the alteration.  If the negligent party is estopped from asserting the alteration the person taking the instrument is fully protected because the taker can treat the instrument as having been issued in the altered form." Id., Off. Cmt. 1.  These sentences, read together, explain the respective liabilities and defenses but do not create an affirmative cause of action.

Comment 2 speaks to application of the statute and explain and defines certain phrases but no language therein indicates that the commentators anticipated an affirmative cause of action for negligence in the statute.  The comment specifically states that "[u]nder the less stringent test the preclusion should be easier to establish." Id. at 2.  It does not speak in terms of the tests defined therein creating an affirmative cause of action but instead in terms of establishing a defense or bar to a cause of action.

There is no ambiguity or lack of clarity in the language of the section, thus it should be enforced as written to give effect to its plain meaning. Ex parte Pfizer, Inc., 746 So.2d at 964.  "This Court may not attempt to discern some other meaning the legislature might have had but did not express in the statute." Id., at 965.  Where "there is no room for judicial construction [,] the clearly expressed intent of the legislature must be given effect." Id.

## CONCLUSION

Accordingly, the Court finds that as a matter of law Ala. Code § 7-3-406 does not create an affirmative cause of action.  Thus, defendant is entitled to summary judgment as to Count 1

on the claim under Ala. Code § 7-3-406.  Therefore, defendant's motion for summary judgment (Doc. 70) is **GRANTED.**

      **DONE** and **ORDERED** this the 5th day of March, 2006.

                                **s / Kristi K. DuBose**
                                **KRISTI K. DuBOSE**
                                **UNITED STATES DISTRICT JUDGE**