# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) | CIVIL ACTION NO 04-0766-KD-C |
| ) | |
| COMPASS BANK, ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

On December 1, 2004, Continental Casualty Company (plaintiff) filed this subrogation action against Compass Bank (defendant) to recover $915,971.00 paid by plaintiff to its insured SCI Corporation as a result of an embezzlement scheme conducted at the central accounting office for four funeral homes owned and operated by SCI. (Doc. 1). Relevant to the pleadings under consideration, the amended complaint alleges in Count I that the defendant failed to exercise ordinary care and good faith in violation of Code of Alabama §§ 7-3-405 and 7-3-406. (Doc. 220).[1]

This matter is before the court on the plaintiff's motion for partial summary judgment on the issue of good faith (Doc. 113), defendant's response (Doc. 126), and plaintiff's reply (Doc. 140), and defendant's motion for summary judgment on the issue of good faith and supporting brief (Docs. 127, 129), plaintiff's response (Doc. 148), and defendant's reply (Doc. 155). As set

---

[1] Plaintiff's claims predicated on Ala. Code § 7-3-404 were dismissed by the court in the order on the first motion for partial summary judgment dated March 4, 2006. (Doc. 262, note 4).

forth in detail below, upon consideration of all matters presented, and after reviewing the record in a light most favorable to the plaintiff, [2] the Court determines that the plaintiff's motion for partial summary judgment as a matter of law as to the issue of good faith (Doc. 113) is due to be **DENIED.** The Court further finds that defendant's motion for partial summary judgment as a matter of law as to the issue of good faith (Doc. 127) is due to be **GRANTED.**

I.     **Factual Background**

1. Service Corporation International (SCI) owned and operated four funeral homes in the Mobile, Alabama area including Radney Funeral Home on Dauphin Street. Continental Casualty Company (Continental) is the fidelity insurer of SCI. (Doc. 1).

2. For twelve years, Vivian Elaine Howe (Howe) also known as Elaine H. Howe was employed by SCI as an Accounting Center Insurance Processing Clerk at SCI's Mobile Accounting Center (MAC) located at SCI/Radney. (Doc. 1). Howe's job duties included processing insurance claims and receiving insurance payments from Brown Services,[3] a pre-arranged funeral insurance provider. (Doc. 1, Doc. 22-1 at pgs. 22-24, SCI internal memorandum of April 26, 2002). Brown Services claims from all four funeral homes were processed at the MAC. (Doc. 1, 128, 113).

3. From June 1996 until March 2002, Howe embezzled approximately $915,971.00 from SCI. Her actions were described as follows in an SCI internal audit memorandum:

---

[2] The Court, when ruling on a motion for summary judgment, "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir. 2004) (citations omitted)

[3] Howe, SCI and Brown Services are not parties to this lawsuit. (Doc. 1).

> Ms. Howe would select at-need accounts which were paid-in-full or several months old with minimal outstanding balances. She then created fake Brown Services policy numbers for the customers and submitted fraudulent claim documents to the Accounting Center Accounts Payable Clerk making it appear the customers had a Brown Services preneed insurance policy.  The fake claim documents were never submitted to Brown Services.  Ms. Howe obtained the refund checks, forged customer signatures on the checks and cashed the checks.  A significant number of the checks were cashed at Compass Bank.
>
> Ms. Howe had been caught cashing customer refund checks in 1999 and again in 2000. Ms. Howe was given a verbal warning in 1999 and a written reprimand in 2000 which stated she would be terminated if she cashed another refund check. Both times Ms. Howe stated she had cashed the checks at the customer's request. Neither incident was reported to Region Management and a detailed review of Ms. Howe's activities was not performed.
> . . .
>
> This investigation was initiated as a result of two incidents which occurred at the [MAC] in March 2002.  Mr. Torston, Funeral Director, requested Betty Mill, Accounting Center Manager, investigate a customer refund check which the family stated had not been received.  Ms. Mills orders a copy of the cancelled check from the Houston Bank Reconciliation Department and found it have been cashed by Ms. Howe.  Ms. Mills and Kenneth Hart, Location Manager, met and agreed to terminate Ms. Howe since she had been give a verbal warning in 1999 and a written reprimand in 2000 not to cash any more customer refund checks. Ms. Howe was terminated on March 11, 2002.  About a week later, Mr. Hart was following up on a Customer Satisfaction Survey comment when he found a copy of a customer refund check in the file.  The file contained a Brown Services Certification Form but did not contain a copy of the Brown Services Policy.  Mr. Hart asked Carol Dorgan, Accounts Payable Clerk, to order a copy of the canceled check from the Houston Bank Reconciliation Department.  When the check arrived, Mr. Hart found Ms. Howe had cashed the check.  Mr. Hart subsequently obtained eleven other canceled checks totaling $8,172, which had been cashed by Ms. Howe.
>
> . . .
>
> Brown Services is a preneed funeral insurance provider exclusive to Alabama residents.  Retail values on Brown Services policies generally range from $100 to $800.  SCI contracts with Brown Services to provide funeral services for Brown Services policyholders.  SCI provides the funeral service and then invoices Brown Services for the insurance proceeds.  It is SCI's practice to refund a customer the value of the Brown Services policy when services have been provided and paid for prior to the family becoming aware of an existing Brown Services policy.

To obtain reimbursement from Brown Services, SCI submits a Certification Form (Brown Services form #156-2-66-25M, certifying the deceased name, policy number and date of death) and an Invoice (Brown Services form #FH69-1000 BKS). Brown Services reimburses SCI monthly for funeral invoiced during the month. The reimbursements from Brown Services do not contain detail policyholder or payment information.

Prior to the September 2000 incident, if a customer refund was required, Ms. Howe only had to submit an SCI Adjustment to Accounts Receivable Form and a copy of the adjusted customer statement from the location's account receivable package to Ms. Mills for approval. The approved documents would be forwarded to an Accounts Payable Clerk for issuance of the refund check. The Accounts Payable Clerk would return the check to Ms. Howe for mailing to the customer.

After the September 2000 incident, Ms. Howe had to submit the Brown Services Certification Form, Brown Services invoice and the SCI Adjustment to Accounts Receivable Form to Ms. Mills for approval. The approved documents would be forwarded to an Accounts Payable Clerk for issuance of a refund check. The Accounts Payable Clerk was instructed to mail the check and not return it to Ms. Howe. Ms. Howe retrieved the refund checks from the mailbox before the courier took the mail to the post office. When a new Account Payable Clerk was hired [,] Ms. Howe obtained the checks from the new Accounts Payable Clerk.

For the period 1997 to March 2002, Brown Services provided us with a report of payments made to the [MAC]. The report contained the name of the insured, policy number, and date paid. Location copies of the Brown Services Invoices and SCI customer rebate check stubs were traced to the Brown Services report. We found 869 refund checks which had been issued based on fraudulent Brown Services documentation. Copies of the cancelled checks obtained from the Houston Bank Reconciliation Department revealed the checks had been cashed by Ms. Howe.

For 1996, we obtained a Check Distribution Report provided by the Accounting Center Manager. Copies of cancelled checks were obtained from the Houston Bank Reconciliation Department for refunds between $400 and $1000 issued from June to December 1996. June 1996 was the last month SCI had checks available on the CD's from the bank. We found 124 checks which had been cashed by Ms. Howe.

We also obtained an AS400 Accounts Payable System report of disbursements made by the Accounting Center for Laotians 4201, 4405, 4406 and 4959 during the period 1998 to March 2002 (disbursements prior to 1998 were not listed on the Accounts Payable System). Based on a review of the report 3,331 customer refund checks were issued during the period. Copies of cancelled checks were

>obtained from the Houston Bank Reconciliation Department for refunds between $400 and $800 which were not included in the Brown Services report testing. We found an additional 240 refund checks which had been cashed by Ms. Howe.

(Doc. 128, SCI/Radney memorandum of April 26, 2002). The memorandum also referenced a "list of procedures which should be in place to control third party reimbursements" and that during the investigation, the investigator determined that these controls were not in place at the MAC. (Id. at pgs. 25-26).

    4. Howe maintained six bank accounts with defendant Compass Bank at various times. (Doc. 113, Exhibit A). She deposited the embezzled forged third-party checks into her personal bank account(s) at the Crichton branch of defendant Compass Bank (Crichton). (Doc. 1, 113).

    5. Continental insured SCI/Radney under a commercial crime policy. On April 11, 2003, after the scheme was uncovered in March 2002, SCI/Radney was compensated by Continental in the amount of $915,971.00 less a $100,000.00 deductible, pursuant to a Partial Payment Agreement and Assignment of Claims. SCI/Radney assigned its rights, title, and interest in all monies that might be recovered to Continental. Plaintiff Continental seeks to recover the sum of $915,971.00 from Defendant Compass Bank. (Docs.1, 113).

## II.     Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] The

---

[4] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

>if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id.  "If the nonmoving party fails to makes 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986))(footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 534 U.S. 1081, 125 S.Ct. 869, 160 L. Ed.2d 825 (2005).

     With this legal framework in mind, the court now turns to the specific grounds upon which the parties base their respective motions for summary judgment.

---

material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

**III.    Argument**

Plaintiff argues that as to Count One it is entitled to judgment as a matter of law that defendant did not act in good faith when it accepted the forged checks for deposit. (Docs. 113, 140, 148). Plaintiff argues that the admissions of defendant's employees show that they acted with knowledge and conscious disregard of highly suspicious circumstances and "red flags." In support plaintiff specifically points to the fact that defendant accepted the checks in violation of its mandatory operating policies and procedures and that at least one teller acknowledged that she was initially suspicious of the transaction. (Docs. 113, 140, 148). Therefore, plaintiff argues that "[a]s a matter of law, a bank cannot meet its burden of showing good faith if it acts with knowledge and disregard of suspicious circumstances". (Doc. 113). Plaintiff asserts that because defendant cannot meet its burden to establish the defense of good faith pursuant to Ala. Code §§ 7-3-405 and 7-3-406, the comparative liability provisions under the code sections do not apply and defendant is liable for plaintiff's full loss. (Doc. 113, 148).

Defendant responds and cross moves for partial summary judgment alleging that the undisputed evidence of record establishes that as a matter of law defendant Compass Bank acted in good faith in connection with the challenged transactions. (Docs. 126, 129, 155). Defendant states that good faith is "honesty in fact" which under the Alabama Commercial Code is determined by a subjective standard. Ala. Code § 7-3-405(b). (Docs. 126, 129, 155). Defendant argues that in order to avoid summary judgment, plaintiff must produce evidence of "dishonesty in fact on the part of a bank employee when the employee accepted these checks for deposit" and that establishing by hindsight that the checks should have been rejected under certain banking

industry standards or that the checks were "suspicious" or "high risk" is not sufficient to establish lack of good faith by defendant.[5] (Doc. 155).

### IV. Discussion

Code of Alabama § 7-3-103 (1975) states that in Article 3, "'[g]ood faith' means honesty in fact in the conduct or transaction concerned." Ala. Code § 7-3-103(a)(4). It appears from the definition provided that good faith is meant to be determined on a subjective basis. Moreover, the court adopts the reasoning in Cagle's Inc. v. Valley Nat. Bank, 153 F. Supp. 2d 1288 (M. D. Ala. 2001) on the issue of whether a subjective standard of good faith applies. In Cagle's, the court found as follows:

> The Defendant has argued that none of Cagle's evidence is sufficient to establish a lack of good faith because there is no evidence that the Defendant subjectively acted in bad faith, and the standard to be applied is a subjective, not an objective standard. Cagle disagrees. Cagle points out that the Eleventh Circuit, applying the definition of good faith in Alabama Code § 7-1-201(19), stated that Alabama "has embraced a test that is composed of both a subjective component and an objective component." In re Joe Morgan, Inc., 985 F.2d 1554 (11th Cir.1993).
>
> The difficulty with relying on this Eleventh Circuit holding is that the relevant statute was amended in 1995, after the Eleventh Circuit ruled in In re Joe Morgan, Inc. See Ala.Code § 7-3-103(a)(4), History. "Good faith" is currently defined in Article 3 as "honesty in fact in the conduct or transaction concerned." Ala.Code § 7-3-103(a)(4). This definition is the same definition as the definition of "good faith" which is found in Alabama Code § 7-1-201(19). According to the Comment

---

[5] The language employed by Compass could be interpreted to indicate that Continental has the burden of proof on the issue of whether Compass lacked good faith. Although the language used in §7-3-405 includes an initial reference to good faith and it is this section Compass references in its brief, §7-3-405 does not require that Continental must prove a lack of good faith in order to recover from Compass for lack of ordinary care. Rather the proof of good faith appears to be an issue only as to establishing a defense pursuant to §7-3-405 and §7-3-406. As the court has previously determined, §7-3-406 does not provide a cause of action but only establishes a defense. (Doc. 264).

8

to the Alabama Code, when the legislature adopted the definition of good faith as it is defined in § 7-3-103(a)(4), the legislature rejected the proposed change by the UCC National Drafting Committee to expand the good faith concept to include observance of reasonable commercial standards of fair dealing. Ala. Code § 7-3-103, Alabama Comment 1. As the Comment explains, the definition which was adopted sets a "'subjective' standard," while the rejected proposed change provided more of an objective standard. Id. Under this commentary, which is afforded substantial weight, therefore, the court must conclude that the good faith definition to be applied in the provision at issue is a subjective standard. Cf. Simmons v. Clemco Industries, 368 So.2d 509, 514 (Ala.1979) (while not controlling, the official comments are a valuable aid in the construction of code provisions)....

It is also clear that the Eleventh Circuit found that there was a judicial gloss importing an objective requirement under § 7-1-201(19). What is not at all clear, however, is, if this judicial gloss of an objective component was not intended by the legislature to apply under the new § 7-3-103(a)(4), why the drafters of the commentary chose the word "retains," in light of the Eleventh Circuit's holding and the cases upon which the Eleventh Circuit relied in In re Joe Morgan, Inc. Perhaps the word "retains" sprang from those Alabama cases decided prior to the amendment of the statute which applied a purely subjective standard of good faith. See C & N Contractors, Inc. v. Community Bancshares, 646 So.2d 1357, 1361 (Ala. 1994) (citing § 7-1-201(19) and citing with approval a Fifth Circuit Court of Appeals decision holding that failure to follow reasonable commercial practices did not constitute a lack of good faith); Frank Davis Buick AMC-Jeep, Inc. v. First Alabama Bank of Huntsville, 423 So.2d 855, 858 (Ala. Civ. App.1982) (identifying the standard in § 7-1-201(19) as a subjective standard); General Electric Credit Corp. v. Humble, 532 F. Supp. 703, 706 (M. D. Ala.1982)(same). In any event, regardless of the cases applying an objective component before the statute was amended, the comment to § 7-3-103 clearly states that the definition adopted is a subjective standard. Ala. Code § 7-3-103, Comment 1. It is only logical to accept that the definition in § 7-3-103(a)(4) was intended by the legislature to have only a subjective component. Had the legislature wanted to define "good faith" as having both a subjective and an objective component, it would have been a simple matter to simply adopt the definition proposed by the drafters of the Uniform Commercial Code. By rejecting this definition, the legislature rejected a definition which clearly applies both a subjective and objective standard, which, as the comment explains, means that this court is to interpret "good faith" as being a subjective test.

Cagle's at 1293-1295.

After review of the Alabama Commercial Code and the analysis presented in Cagle's, the

9

court finds that a subjective analysis must apply to a determination whether defendant acted in good faith, i.e., honesty in fact, in accepting the checks for deposit. Additionally, whether defendant acted in a reasonable commercial manner is not determinative of whether the defendant acted in good faith under the Alabama Commercial Code. Ala. Code § 7-3-103, Alabama Comment 1. See also C&N Contractors, Inc. v. Community Bancshares, Inc., 646 So.2d 1357, 1361 (Ala. 1994) citing with approval British Caledonian Airways, Ltd. v. First State Bank, 819 F.2d 593 (5th Cir. 1987) ("'holding that ... a bank's negligence or failure to follow reasonable commercial practices did not constitute lack of good faith'").

Recognizing that the burden rests on defendant to establish that it acted in good faith in order to avail itself of the defenses in Ala. Code § 7-4-405 and § 7-4-406, the court now turns to the evidence presented on the issue of good faith as support for the respective motions for partial summary judgment.

Plaintiff alleges that the following evidence supports its claim that the court should grant summary judgment and thus determine that as a matter of law defendant failed to act in good faith:

1. In July 1995, Howe opened her primary fraud account at Crichton as "Elaine H. Howe, c/o Radney Funeral Home". Employees at the Crichton branch of Compass Bank knew Howe was employed with Radney. Based on this information, the plaintiff infers that defendant failed to act in good faith because it did not notify Radney of the "c/o Radney Funeral Home" notation on the account. (Doc. 113, Exhibit H, I; Doc. 148).

2. The teller that opened the account, Jeannette Taylor, testified at her deposition on June 20, 2005, that she did not have authority as a teller in July 1995 to open an account, and thus her

unauthorized opening of the account indicates a lack of good faith on the part of defendant. (Doc. 113, Exhibit C). Plaintiff relies upon the signature card which is printed "J. Taylor" for its conclusion that Jeannette Taylor opened the account.[6] (Doc. 113).

    3. The bank employees at Crichton failed to assist in SCI/Radney's investigation of the fraud once it was discovered by Radney. Plaintiff states that SCI Investigator James Downs visited the Crichton branch but the employees refused to speak with him. (Doc.113).[7]

    4. Numerous suspicious circumstances, <u>i.e.</u> "red flags", occurred in regard to Howe's "inherently high risk" third party check deposits but were not reported by defendant's employees on a Suspicious Activity Report[8] and consequently were not investigated. Moreover, employees who failed to recognize these "high risk" transactions, violated defendant's own internal

---

    [6] Defendant argues that the signature of "J. Taylor" (July 7, 1995) predated Jeannette Taylor's transfer to Crichton by one month (August 1995) and that Jeannette Taylor testified that the signature was not hers. (Doc. 126, 129).

    [7] Defendant responds to this statement and points to Downs' deposition testimony wherein he stated that he could not recall exactly where the branch was located. (Doc. 126, 129, Exhibit 8). Downs testified that he went to a branch and spoke with the manager who asked him to wait. After waiting thirty minutes to an hour, the manager returned and said that the bank's attorney told her to tell Downs that he would need to get a subpoena for the information. (Doc. 129, Exhibit 8, at deposition pages 36-38, Doc. 194).

    [8] Defendant's Security Policies and Guidelines, at section 101-9, entitled "Suspicious Activity Reports (SAR)" identifies the circumstances under which a financial institution is required to make a report, sets forth the procedure for preparing a Suspicious Activity Report (SAR) and also states as follows:

> The transaction has no business or apparent lawful purpose, or is not the sort in which the particular customer would normally be expected to engage, and the financial institution knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.

(Doc. 113, Exhibit R.)

11

operating policies and procedures including teller training practices and their violations, i.e., their failure to report, support an inference that defendant failed to act in good faith. (Doc. 113, 140, 148).

5. Bank employees violated provisions of the "Banking Office Manual" (BOM) which provides "general rules governing teller responsibility" and explains the fraud loss prevention procedure for handling third party checks, (Doc. 113, Exhibit K);[9] the "Loss Prevention FAQS"

---

[9] Defendant's Banking Office Manual ("BOM") 505-1 in the section entitled "Guidelines for Accepting Deposits", on the subject of "Responsibility of Receiving Teller", dated April 1996, provides, in pertinent part, as follows:

> 7. Check to see that all checks are endorsed by the payee(s) and the depositor, if different. . . .
>
>> b) Verify that the endorsement is complete and acceptable to our bank. When we accept an item for deposit and put our bank's endorsement on it, we guarantee all prior endorsements (meaning prior endorsers' signatures are genuine and authorized). Exceptions to these guidelines are to be approved by the Administrative Manager, Quality Service Manager or designee up to check cashing approval limit.
>> . . .
>> - All payees other than the depositor must endorse the check exactly as their names appear on the face of the check in the presence of the teller.
>> . . .
>
> 9. Since certain deposits have greater risk to the bank than others, review all deposits to determine if they fall into a high risk category. That review should include a careful check of endorsements as this is our primary defense against most fraud losses. Our insurance coverage has an extremely high deductible and is not a substitute for careful deposit handling. Refer deposits described below to the Administrative Manger, Quality Service Manager or designated person for approval.
>> . . .
>> g) Checks which do not meet the endorsement requirements in Step 7b .
>> . . .

booklet which admonishes employees to "follow policies and procedure" and not "make exceptions" (Doc. 113, Exhibit L); the teller training materials prepared by the Loss Prevention Unit, Leaders and Participants Guides, entitled "Topic 2, Con Artists and Scams" (Doc. 113, Exhibit M);[10] and the "Know Your Customer" rule, an industry standard similar to defendant's SAR. (Doc. 113).

6. Bank employees John W. McNichol, Jr., Pamela Jackson, Valerie Dow, Dorothy Dinkins have admitted that third party checks are inherently suspicious and "high risk" and that defendant's policies were not followed. (Doc. 113, Exhibit P, at deposition pages 106, 119-20, 123-26; Exhibit Q, at deposition pages 78-79; Exhibit S, at deposition pages 5-6, 10; Exhibit J, at deposition pages 88-92).

7. The defendant lacks a valid explanation for accepting the checks for deposit. Plaintiff relies in part on teller David Owen's testimony that when he first questioned Howe's deposits, he was told by either Green or Jackson, both long-term tellers, to accept the third party checks and

---

13. Consult the Administrative Manager, Quality Service Manager or designated person on any questionable transaction.

(Doc. 113, Exhibit K).

[10] Defendant's booklet entitled Topic II, Con Artists and Scams, Leader's Guide, warned employees as follows:

> **Preventing Scams.** One of the keys to preventing loss is being aware of common fraud techniques and scams that are used frequently. You will learn more about some of these scams in detail while viewing the video. As you learn about these tricks, remember that the best prevention is always follow policy and procedures. **DO NOT MAKE EXCEPTIONS!**

Doc 113, Exhibit M (emphasis in original).

13

was told by Jackson that Howe cashed the checks for Radney's customers. (Doc. 113, Exhibit N, at deposition pages 42-43, 52, 55, 117, 119). Plaintiff argues that Owen's testimony is an admission by defendant that it had no valid explanation for accepting Howe's third party checks and thus failed to act in good faith. (Doc. 113).

8. The volume (over 1,300 third-party checks each payable to a different named payee) and the frequency (up to 30 times a month) of the deposits as early as March 1996, constitute suspicious activity and "red flags" which defendant's employees failed to report, thus defendant did not act in good faith. (Doc. 113, Exhibit F, G, H, I). Plaintiff relies upon the testimony of Celeste Barlow who stated that she "just can't imagine that that would go on without suspicion" and that she did not see how it could be explained. (Doc. 148, 140, Exhibit B at deposition pages 40, 48); Pamela Jackson "(only 'plausible explanation' . . . was that they were stolen)"[11] (Doc. 113, Exhibit Q at deposition page 102); and the testimony of Jennifer Gaston Gontarski, branch manager after Helen Sylvester. (Doc. 140, Exhibit C, at deposition pages 66-67 ("If she came to me that many times [without a valid ID of the named payee] it would have been a red flag").

---

[11] Pamela Jackson, senior teller, testified as follows:

> Q. Is there any explanation that you can think of now, other than that she either stole them from the two people or stole them from her employers?
> . . .
> A. From what you have said, she had - - she embezzled these checks. She had stolen them.
> Q. And that's the only plausible explanation for why she'd be in possession of not just one, but two third-party checks at the same time, correct?
> . . .
> A. After what you have stated earlier, yes. But when this transaction was taken, I had no idea it was stolen.

(Doc. 129, Exhibit 3, at deposition page 102) (objections of counsel omitted).

In regard to the volume of deposits, plaintiff relies upon Dinkins' testimony as follows:

> Q. ... In addition to the fact that each of these twelve hundred or more checks were third party checks, and thus a high risk transaction, that bank policy and procedure that governs that type of transaction applies to even a single check; is that right?
> A. Yes.
> …
> Q. And if in fact you had multiple third party checks presented by the same person for deposit to their personal account, that heightens the element of risk; does it not?
> A. Yes.
> Q. Moreover, if it's not just multiple third party checks, but in fact great frequency, that heightens it even
> …
> A. Yes.
> Q. And, in fact, the customer presenting the high risk third party checks heightened by the number of checks heightened again by frequency is known to be employed by the drawer of the checks, that raises the risk even more, correct?
> …
> A. Yes.
> Q. Because then you're faced with asking what is this employee of the drawer doing in possession of third party checks paid to all these different payees, correct?
> A. Correct.

(Doc. 113, Exhibit J at deposition pages 73-75).

> Q. Well, again, if you can't have or offer any reason why the transactions make sense, and then you see the frequency is off the charts, where she seems to have a fistful of third party checks, none of them payable to her, drawn on her employer, that is highly suspicious, is it not?
> …
> A. Yes.
> Q. Okay. And they're suspicious based on multiple red flags associated with those transactions. Is that fair?
> …
> A. Yes.
> Q. When you have one red flag, you're required to slow down. When you have more than one red flag, you're required to take action and investigate it; are you not?
> A. Yes. But going back to the guidelines, it says the managers can okay it. If it were a situation where we questioned it, you know, it would go to either myself or the manager, you know, if it were over their limit.
> Q. Bear in mind, however, that's for a single third party check; is that right?

>…
>A. Yes.
>...
>Q. The manager that is authorized to make exceptions for third party checks is, herself or himself, governed by bank policy and procedure on addressing red flags and suspicious activity reporting, correct?
>…
>A. Correct.
>Q. So not only would a trained teller be expected to look at the transaction history on the account and kick it upstairs, again, for that reason, the manager, presumably even more trained, would be required to do their own investigation, correct?
>…
>A. Correct.
>Q. Now, if none of these checks should have been accepted, as you've testified before, under the bank's written policies and procedures and emphasized admonitions to not make exceptions to those procedures, once someone does the most modest investigation to look at this transaction history, you then have a very suspicious set of circumstances. And if one acts on those suspicions, one would have to do an SAR, correct?
>…
>A. Correct.

(Doc. 113, Exhibit J, at deposition pages 88-92 (counsel's objections excluded).

8.  Helen Sylvester, a manager with actual notice of a third-party check drawn on Howe's employer and offered for deposit to Howe's personal account, failed to complete a SAR and her failure supports an inference that defendant failed to act in good faith.(Doc. 113, Exhibit R).[12]

9. Admissions by numerous bank employees that they failed to report Howe's activity despite the volume and frequency of the deposits, the "red flags" and "highly suspicious

---

[12] Plaintiff also states that Sylvester was terminated from the Skyline Branch after she left Crichton for opening seventy dummy accounts while she was at both locations in order to excel in an employee incentive program. (Id.)  Plaintiff asserts that Sylvester opened such an account at Crichton for Howe in April 1998. (Doc. 113).  Plaintiff argues that from these circumstances the court may infer that Sylvester "acted in collusion with Howe, for whatever reason" and failed to complete a SAR on transactions without reasonable explanation, and therefore, defendant failed to act in good faith.  The court finds that the facts as presented do not support a reasonable inference of collusion between Sylvester and Howe on the forged checks.

circumstances", and that Howe's checks were not accepted in the customary manner. Plaintiff infers from this evidence that defendant's employees acted in collusion with Howe or at least with knowledge of her scheme.[13]

It is obvious that the plaintiff's proffered evidence is simply not sufficient to establish as a matter of law that the defendant's acts of accepting the forged checks were not done in good faith. As the issue of whether the bank acted in good faith is subjective, the evidence presented does not, as a matter of law, show a lack of good faith. This is especially true in light of the evidence presented by the defendant and summarized below. Accordingly, plaintiff's motion for partial summary judgment (Doc. 113) is **DENIED**.

Defendant also requests summary judgment in its favor on the issue of good faith. Defendant asserts that the evidence is indisputable that the bank employees acted in good faith in connection with accepting the forged checks from Howe. In support the defendant presents the following evidence in sum.

1. Testimony from the tellers, managers and supervisors which show that they believed that the checks were acceptable for deposit under defendant's policies and procedure when they accepted the checks. (Doc. 129, Exhibit 1, at deposition pages 33, 88, 95, 103, 118-119; Exhibit 2, at deposition pages 103-105, 113-114, 138-139; Exhibit 3, at deposition pages 85-86, 88-89, 100-102, 109-111, 121-123; Exhibit 4, at deposition pages 64, 75, 85-86; Exhibit 6, at deposition pages 134-135, 153-154).

2. Howe was thought to be a good customer. Specifically, Howe had been banking at

---

[13] Plaintiff argues that "the facts are, at a minimum, in dispute as to whether Compass personnel were aware of or colluded in Howe's scheme." (Doc. 148)

17

Compass since 1985, eleven years before the challenged transactions began. (Doc. 129, Exhibit 2, deposition pages 123-124).

3. The tellers who accepted the checks did not subjectively believe them to be suspicious or high risk. (Doc. 129, Exh.1 at 33, 88; Exh 2 at 123-124, 140, 145, 179, 207-208, 236; Exh. 3, 100, 102, 110-111, 121-123; Exh. 4 at 64, 75, 85-86; Exh.6 at 140).

4. Plaintiff's failure to present any evidence which shows that any employee had actual knowledge that the checks presented by Howe for deposit were forged.

The plaintiff responds by incorporating its evidence as summarized herein. Supra, p. 10-16.  Specifically, plaintiff points to the nature of the transactions which involved more than 1300 forged checks, the evidence that bank policy was not followed, the inference from the evidence that it would be unreasonable for anyone to subjectively believe that the checks were not suspicious or high risk, the inference from the evidence that defendant had no valid reason for accepting the checks, and the inference from the evidence that because there was no valid reason for accepting the checks, the employees may have been colluding with Howe.  Based on this evidence, the plaintiff argues that at a minimum it is a jury issue as to whether defendant Compass acted in good faith when it accepted the forged checks.

A search of Alabama case law turns up very little on the application of the term "good faith" as it is used in Article 3 of the Alabama Commercial Code.  "Good faith" is mentioned briefly in C&N Contractors, Inc. v. Community Bancshares, Inc., 646 So.2d 1357, 1361 (Ala. 1994) where the Alabama Supreme Court, when discussing whether the defendant failed to act with "honesty in fact", cites with approval British Caledonian Airways, Ltd. v. First State Bank, 819 F.2d 593 (5th Cir. 1987).  In British Caledonian, the court held a bank acts in good faith

18

unless the bank actually knew that the check was forged. Id. at 596. Moreover, the court stated that the test for good faith was the actual belief of the defendant and not the reasonableness of that belief. Id. However, the court also stated that "in some cases a large number of strong 'should have knowns' may support a jury inference of 'did know'". Id. at 598. In other words, the jury may not believe the defendant's assertion of good faith in the face of evidence that supports an inference that the defendant had actual knowledge. The court adopts the holding in British, as it is evident that the Alabama Supreme Court has approved the holding on the issue of what constitutes "honesty in fact".

In this case the plaintiff points to numerous negligent acts of the defendant's employees to support its contention that defendant "acted with knowledge and conscious disregard of suspicious circumstances". However, even if defendant acted with knowledge of objectively suspicious circumstances, which might be reasonably inferred from plaintiff's evidence, that is not sufficient to create a genuine issue as to defendant's evidence that no employee acted with actual knowledge of the forgery. There simply is not enough evidence from which a reasonable jury could find that any employee who accepted a check had actual knowledge that the check was forged. There is also not enough evidence from which a reasonable jury could infer that any employee had actual knowledge. Plaintiff's evidence and the reasonable inferences drawn from this evidence, if believed, may very well establish negligence and even a failure to follow bank policy. However, the evidence does not create a genuine issue as to the defendant's good faith.

## **CONCLUSION**

Accordingly, defendant's motion for partial summary judgment as to the issue of good

19

faith (Doc. 127) is **GRANTED** and plaintiff's motion for partial summary judgment (Doc. 113) is **DENIED.**

    **DONE** and **ORDERED** this the 9th day of March, 2006.

                                       **s/ Kristi K. DuBose**
                                       **KRISTI K. DuBOSE**
                                       **UNITED STATES DISTRICT JUDGE**